**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PC-41 DOE, | |
| Plaintiff, | |
| vs. | Case Number 1:20-cv-03628-DG-SJB |
| POLY PREP COUNTRY DAY SCHOOL; WILLIAM WILLIAMS; MICHAEL NOVELLO, | |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

PHILLIPS & PAOLICELLI, LLP
Victoria E. Phillips
Diane Paolicelli
Michael DeRuve
Phillips & Paolicelli, LLP
747 Third Avenue, Sixth Floor
New York, New York 10017
212-388-5100
vphillips@p2law.com
dpaolicelli@p2law.com
mderuve@p2law.com

*Attorneys for Plaintiff*

{00059319}

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

SUMMARY OF THE RELEVANT ALLEGATIONS.....................................................3

STANDARD OF REVIEW……………………………………………………11

ARGUMENT ...................................................................................................12

I.   DEFENDANTS' MERITLESS CHALLENGE TO THE CVA UNDER NEW YORK
     STATE'S CONSTITUTION HAS BEEN RIGHTLY REJECTED BY FEDERAL AND
     STATE COURTS ..................................................................................13

     A.  As Magistrate Bulsara Recognized, Jurists Have Repeatedly Rejected New York State
         Constitutional Challenges to the CVA, which are "Without Merit" ...........................13

     B.  The Pertinent Legal Standard……………………………………………………15

     C.  The Case on Which Defendants Rely Do Not Support Their Argument...................16

             1. *Robinson v. Robins Dry Dock & Repair Co*………………………………17

             2. *Gallewski v. H. Hentz & Co*……………………………………………..17

             3. The New York Court of Appeals rejected Defendant's Due
             Process Argument in *Matter of World Trade Ctr.*...................................................18

             4. *Zumpano v. Quinn* has nothing to do with the issue before the
             Court Except to Support the Policies Underlying the CVA....................................20

     D.  The CVA is Reasonable Response to Remedy Injustice, Protect Children and Restore
         Justice To Thousands of Abuse Survivors................................................................20

     E.  Without the CVA, There Would be Tremendous Injustice as Many Survivors Are
         Incapable of Seeking Help or Taking Legal Action For Years into Their
         Adult Lives .........................................................................................................24

II.  AS DEFENDANTS ESSENTIALLY CONCEDE, PLAINTIFF'S FIRST CAUSE OF
     ACTION IS PROPERLY PLED AND STATES A VIABLE CLAIM  .........................27

III. DEFENDANTS' CHALLENGE TO THE NEGLIGENT, RECKLESS, AND WILLFUL
     MISCONDUCT COUNT IS UNAVAILING ..............................................................29

IV.  PREMISES LIABILITY WAS PROPERLY PLED.....................................................31

V.     THERE IS NO BASIS FOR DISMISSING THE CLAIM THAT DEFENDANTS
       BREACHED A DUTY *IN LOCO PARENTIS* ...............................................................32

VI.    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS WAS PROPERLY
       PLED....................................................................................................................................34

VII.   AS MULTIPLE COURTS HAVE HELD, PLAINTIFF'S STATUTORY CLAIMS ARE
       VIABLE.................................................................................................................................35

VIII.  DEFENDANTS' ASSERTION THAT COUNTS ARE DUPLICATIVE OFFERS
       NO BASIS FOR DISMSISAL..........................................................................................36

IX.    NOVELLO WAS PROPERLY NAMED AS A DEFENDANT ...................................37

       CONCLUSION ....................................................................................................................38

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ...................................12

*Brown Media Corp. v. K&L Gates, LLP*,
    854 F.3d 150 (2d Cir. 2017) ...................................12

*Brown v Netflix, Inc.*,
    462 F. Supp 3d 453 (S.D.N.Y. 2020) ...................................12

*Cosgriffe v. Cosgriffe*,
    262 Mont. 175 (1993)...................................23

*Dalton v. Pataki*,
    5 N.Y.3d 243 (2005)...................................15

*Deutsch v. Masonic Homes of Cal., Inc.*,
    164 Cal.App.4th 748 (Cal.Ct.App.2008)...................................23

*Doe v. Hartford Roman Catholic Diocesan Corp.*,
    317 Conn. 357 (2015)...................................23

*Evans v. Eckelman*,
    265 Cal. Rptr. 605 (1990)...................................25

*Ferguson v. City of New York*,
    118 A.D.3d 849 (2d Dept. 2014) ...................................33

*Ferrara v. Galluchio*,
    5 N.Y.2d 16 (1958) ...................................34

*Gallewski v. H. Hentz & Co.*,
    301 N.Y. 164, 93 N.E.2d 620 (1950) ...................................16, 17, 18, 19

*Garcia v. City of N.Y.*,
    222 A.D.2d 192 (1st Dept. 1996)...................................30

*Giuffre v. Dershowitz*,
    2020 U.S. Dist. LEXIS 78596 (S.D.N.Y. Apr. 8, 2020) ...................................2, 13, 14

*Graber v. Bachman*,
    27 A.D.3d 986 (3d Dept. 2006) ...................................2, 34

{00059572}

*Hammer v. Hammer,*
    418 N.W.2d 23 (Wis. Ct. App. 1987)...................................................................................25

*Hymowitz v. Eli Lilly & Co.,*
    73 N.Y.2d 487 (1990)............................................................................................................17

*Ironwood, L.L.C. v. JGB Props., LLC,*
    130 A.D.3d 1527 (4th Dept. 2015).................................................................................2, 30

*Jasmin v. Ross,*
    177 Or. App. 210 (Or. Ct. App. 2001) ...........................................................................25

*Jaume v. Ry Mgt. Co.,*
    2 A.D.3d 590 (2d Dept. 2003) .......................................................................................2, 31

*K.E. v. Hoffman,*
    452 N.W.2d 509 (Minn. 1990)...........................................................................................25

*Kenneth R. v. Roman Catholic Diocese of Brooklyn,*
    229 A.D.2d 159 (2nd Dept. 1997).....................................................................................27

*Korst v. McMahon,*
    136 Wash. App. 202 (2006)................................................................................................25

*LaValle v. Hayden,*
    98 N.Y.2d 155 (2002)..........................................................................................................15

*Manigault v. City of N.Y.,*
    2012 U.S. Dist. LEXIS 205005 (S.D.N.Y. Apr. 19, 2012) ...............................................3, 36

*McCann v. Walsh Const. Co.,*
    123 N.Y.S.2d 509 (1953), *aff'd without op.*, 306 N.Y. 904 (1954) ......................................17

*Meiers-Post v. Schafer,*
    427 N.W.2d 606 (Mich. Ct. App. 1988)...........................................................................25

*Mirand v. City of New York,*
    84 N.Y.2d 44 (1994)............................................................................................................33

*Nallan v. Helmsley-Spear, Inc.,*
    50 N.Y.2d 507 (1980)........................................................................................................2, 31

*Pasternak v. Lab. Corp. of Am. Holdings,*
    27 N.Y.3d 817 (2016)...........................................................................................................30

*Matter of Regina Metro. Co., LLC v. NY State Div. of Hous. & Community
    Renewal,*
    35 N.Y.3d 332 (2020)......................................................................................................20, 21

*Roberts v. Caton*,
224 Conn. 483 (1993) ...................................................................................................... 26

*Robinson v. Robins Dry Dock & Repair Co.*,
238 N.Y. 271, 144 N.E. 579 (1924) ................................................................ 16, 17, 18, 19

*Sheehan v. Oblates of St. Francis de Sales*,
15 A.3d 1247 (Del. 2011) ................................................................................................ 23

*Sliney v. Previte*,
473 Mass. 283 (2015) ...................................................................................................... 26

*Stratmeyer v. Stratmeyer*,
1997 S.D. 97 (1997) .................................................................................................. 24, 26

*Timothy Mc. v. Beacon City Sch. Dist.*,
127 A.D.3d 826 (2d Dept. 2015) ..................................................................................... 33

*United States v. Cohn*,
682 F. Supp 209 (S.D.N.Y. 1988) ................................................................................. 3, 37

*Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig.*,
30 N.Y.3d 377 (2017) ............................................................................................ *passim*

*Zimmerman v. Poly Prep Country Day Sch.*,
2011 U.S. Dist. LEXIS 40704 (E.D.N.Y. Apr. 13, 2011) .................................................. 15

*Zimmerman v. Poly Prep Country Day Sch.*,
888 F. Supp. 2d 317 (E.D.N.Y. 2012) ......................................................... 15, 27, 29, 30

*Zumpano v. Quinn*,
6 N.Y.3d 666 (2006) ................................................................................................. 20, 22

## Statutes and Other Authorities

Ann Marie Hagen, Note, *Tolling the Statute of Limitations for Adult Survivors of
Childhood Sexual Abuse*, 76 IOWA L. REV. 355 (1991) ................................................... 26

Ariz. Rev. Stat. Ann. § 12-514 ........................................................................................ 23

Cal. Civ. Proc. Code § 340.1 .......................................................................................... 23

Conn. Gen. Stat. Ann. § 52-577d ................................................................................... 23

CPLR § 208(b) ................................................................................................................ 36

CPLR § 214-g ..................................................................................................... 1, 16, 21, 22

D.C. Code Ann. § 12-301 .......................................................................................23

Del. Code tit. 10, §8145 ........................................................................................23

Haw. Rev. Stat. Ann. § 657-1.8 ............................................................................23

M. Hamilton, *The Time Has Come for a Restatement of Child Sex Abuse*, 79
    BROOK. L.REV. 397, 404-405 (2014).................................................................27

Minn. Stat. Ann. § 541.073 ...................................................................................23

Mont. Code Ann. § 27-2-216 .................................................................................23

N.J. Stat. Ann. § 2A:14-2b ....................................................................................23

Restatement, Torts 2d, § 344 .................................................................................31

Social Services Law § 413 ................................................................................3, 36

Social Services Law § 420 ................................................................................3, 36

Social Services Law § 420(2) .................................................................................35

Vt. Stat. Ann. tit. 12, § 522....................................................................................23

Fed. R. Civ. P. 12(b)(6)......................................................................................2, 12

## INTRODUCTION

Plaintiff PC-41 Doe ("Plaintiff")[1] is a survivor of profound and repeated childhood sexual abuse by a Coach Philip Foglietta. For over two decades, that serial pedophile worked at Defendant Poly Prep Country Day School ("Poly"), a private school in Brooklyn, New York. He used that position to meet, groom, and molest children. Plaintiff's abuse by Foglietta spanned several years, sometimes occurring as often as several times each week, on Poly's premises.

Foglietta's molestation of children at Poly spanned from the 1960s through the 1980s. Yet, despite multiple complaints from students and parents, Defendants turned a blind eye, refusing to accept that Poly's students were suffering from abuse. The school's administrators, including headmaster and named Defendants William Williams and Michael Novello, failed to take steps to protect students, foreseeably causing serious harm that persists to this day.

In 2019, New York's Legislature passed the Child Victims Act ("CVA"), CPLR § 214-g, opening the courthouse doors to survivors of sexual abuse who were too traumatized to come forward at such a young age. Through the CVA, the Legislature chose to give survivors an opportunity to bring claims seeking redress for the harms they suffered.

Defendants do not dispute the horrific nature of the alleged acts. They have publicly acknowledged[2] that Foglietta abused students on Poly's grounds. Yet, despite paying lip service to the Legislature's "noble" motivations in passing the CVA, and expressing "sympath[y]" for children who do not contemporaneous report sexual abuse, Defendants try to evade liability by making meritless, repeatedly rejected legal arguments. Docket ("Dkt.") 15-1, pp.5, 17.

---

[1] In light of the sensitive nature of this case involving childhood sexual abuse, Plaintiff was given leave to use a pseudonym. *See* Docket ("Dkt.") #17-1 and Magistrate Bulsara's Order of 1/8/21.
[2] *See* Michael O'Keefe, *Poly Prep Issues Formal Apology to Men Who Claim They Were Sexually Abused By Iconic Football Coach Phil Foglietta*, New York Daily News, (February 22, 2014), https://www.nydailynews.com/sports/i-team/polp-prep-apologizes-men-claim-sexually-abuse-fogiletta-article-1.1664393 (last accessed March 1, 2021).

To illustrate, Defendants' main argument is that the CVA violates New York's due process clause. That argument has been rejected on at least five occasions. Each time, jurists found that the CVA is a constitutional and reasonable response by New York's Legislature to remedy the injustice of systemic sexual abuse. *See, e.g., Giuffre v. Dershowitz*, 2020 U.S. Dist. LEXIS 78596, at * 5-6 (S.D.N.Y. Apr. 8, 2020) (Preska, J.); **Ex. B**[3], p.12; **Ex. C**, pp.9-10; **Ex. D**, pp.5-6; **Ex. E**, pp.2-4. As Magistrate Bulsara recently wrote, *see* Dkt. #24, Defendants' contrary position is devoid of merit, and rests on a misreading of New York law.

Defendants also assert that certain (but not all) of the Complaint's counts are subject to dismissal under Fed. R. Civ. P. 12(b)(6). Plaintiffs appreciate Defendants' admission that the Complaint states a claim against both Poly and the school's longtime headmaster, Defendant Williams, for negligent retention, supervision and direction. Dkt. 15-1, p.19, n.4. Yet, their efforts to show that the remaining counts must be dismissed are unavailing.

For instance, negligence and negligent infliction of emotional distress are black letter claims in New York. *See, e.g., Solomon v. City of New* York, 66 N.Y.2d 1026, 1027 (1985); *Graber v. Bachman*, 27 A.D.3d 986, 987 (3d Dept. 2006). Allegations of willful or reckless conduct allow Plaintiffs to recover damages, and can support a claim for punitive damages. *See Ironwood, L.L.C. v. JGB Props., LLC*, 130 A.D.3d 1527, 1529 (4th Dept. 2015). Since the repeated abuse in this case occurred on Poly's premises, Plaintiff also properly alleged premises liability, another familiar legal theory in New York. *Jaume v. Ry Mgt. Co.,* 2 A.D.3d 590, 591 (2d Dept. 2003). Further, as New York's courts have recognized, Plaintiffs can bring a civil claim in CVA actions under New York's Social Services Law. *See* **Ex. H** (*Werner v. Taconic*), pp.7-8; **Ex. F** (*LaPorta*), p.3; **Ex. G** (*PB-31* decision), pp.3-4 & (*Reno* decision), pp.2-3.

---

[3] References designated "**Ex.**" followed by a letter are to exhibits to the Affirmation of Victoria E. Phillips accompanying this memorandum of law. References designated "¶" followed by a number are to paragraphs of the Complaint, a copy of which is being included in the Phillips Aff. as **Ex. A**.

Defendants' bid to dismiss counts as duplicative is also unavailing. Not only do the counts have different elements, but "there [also] is no inherent legal error in bringing more than one cause of action with the same factual underpinning." *Manigault v. City of N.Y.*, 2012 U.S. Dist. LEXIS 205005, at *11 (S.D.N.Y. Apr. 19, 2012). *See also United States v. Cohn*, 682 F. Supp 209, 219 (S.D.N.Y. 1988) (*citing* Fed. R. Civ. P. 8(a)). Furthermore, New York courts in other CVA actions have declined to dismiss properly pled counts on the ground they are "duplicative." *See, e.g.,* **Ex. E,** *Dolgas*, p.5 ("'[a]t this early juncture ... plaintiff should be permitted to plead in the alternative [and the claim] should not be dismissed as duplicative ...'") (*quoting Man Advisors, Inc. v. Selkoe*, 174 A.D.3d 435 [1st Dept. 2019]).

Finally, there is no basis for dismissing the claims against former Poly administrator Novello. As related, Foglietta abused multiple students at Poly Prep between 1966 and 1986. ¶¶5, 52, 138. Plaintiffs allege that Novello was among those responsible for the training, supervision, and disciplining of Foglietta during the time Plaintiff was abused. ¶39. As the Complaint alleges, Novello worked as an administrator at Poly for over a decade, including as Head of Poly's Middle or Lower School from 1972 and 1983. ¶¶12, 37-40, 79. That included the entire period when Plaintiff was being repeatedly abused by Foglietta. Plaintiffs further allege that Defendants including Novello "operated, and/or controlled the premises known as POLY PREP, including the areas where the sexual abuse of Plaintiff occurred." *Id.* at ¶192. Thus, Novello, like Defendant Williams, has been properly named and must remain in the case.

## SUMMARY OF THE RELEVANT ALLEGATIONS

Poly is a private school in Brooklyn, New York whose students are in grades five through twelve. ¶¶30-31. Plaintiff attended Poly as a child from approximately fifth through twelfth

grade in the 1970s and 1980s. ¶¶42, 58.  Since Plaintiff was a vulnerable child attending the school, its physical education, and extracurricular sports programs, Defendants were entrusted with and had a duty to protect his well-being, care, and safety. ¶¶200-201.

Rather than being protected from harm as a student, Plaintiff repeatedly experienced unlawful sexual abuse on Poly's premises. ¶1. His abuser was Coach Philip Foglietta. Foglietta was a serial pedophile and sexual predator who worked as a physical education teacher and coach at Poly from approximately 1966 to 1991. ¶¶2-5, 47-48.

Foglietta would not have been in a position to sexually abuse Plaintiff had Defendants not been negligent in the hiring, retention, supervision, and direction of him. ¶168. Defendants knew or disregarded the substantial probability that Foglietta would cause severe emotional distress to minors including Plaintiff, ¶199, and were willful, wanton, malicious, reckless, and/or outrageous in their disregard for the rights and safety of Plaintiff. ¶170. Their misconduct included failure to use reasonable care in hiring, appointing, assigning, and retention of Foglietta, failure to properly investigate his background and employment history, and/or hiring, appointing and/or assigning him to Poly, when they knew or should have known of facts that would make him a danger to children. ¶166. Plaintiffs also allege that Defendants did not use reasonable care in their supervision and direction of Foglietta, failed to monitor his activities, failed to oversee the manner in which he carried out the duties to which Defendants assigned them, even though they knew or should have known that Foglietta posed a threat of sexual abuse to minors; failed to adequately investigate Foglietta's dangerous activities and remove him from their premises; failed to have policies and practices in place that would have prevented this abuse; and were otherwise negligent. ¶167.

Instead of protecting vulnerable students in their custody, Defendants placed Foglietta in positions where he regularly had unsupervised access to and worked with children as an integral part of his work. ¶44. In Plaintiff's case, Foglietta was Plaintiff's physical education teacher at Poly in approximately 5th through 7th grades. Plaintiff was also under Foglietta's supervision at Poly during high school as a member of Poly's football team. ¶¶12-13, 55-56.

Plaintiff's abuse occurred between approximately 1976 and 1983. ¶58. The abuse, which took place on school premises at Poly, was profound in nature. ¶57. Foglietta unlawfully abused Plaintiff sometimes as often as several times per week for years. ¶59. The abuse included but was not limited to touching and fondling Plaintiff's buttocks and genitals, and penetrating Plaintiff's anus with his fingers, conduct that has caused Plaintiff to suffer grave injury, including physical, psychological and emotional injury. ¶¶60, 171.

In addition to the school itself, Plaintiffs named as Defendants William Williams and Michael Novello. Williams was Poly's headmaster from approximately 1970 to 2000, which included the period that Plaintiff attended Poly. ¶¶34-45, 42, 58. Novello was also an administrator at Poly during that period, and on information and belief, he served as the head of Poly's Middle School between 1972 and 1983. ¶¶37-38, 79.

Both Williams and Novello were responsible for the training, supervision, and disciplining of Foglietta, who molested students before, during, and after Plaintiff's time at Poly. ¶¶36, 39. 70. By the time Foglietta was abusing Plaintiff, both Williams and Novella had notice of Foglietta's history of abusing students. ¶¶68-110. Nonetheless, neither warned students, their parents, legal authorities, or the general public that Foglietta posed a risk of sexually abusing minors prior to or during Plaintiff's years at Poly. ¶113.

In approximately 1979-80, Plaintiff himself told a Poly homeroom and music teacher, known to him as Mr. Morangelli, about Foglietta's inappropriate conduct. ¶61. Although Plaintiff was told that his report would be looked into, on information and belief, Poly did not conduct a thorough investigation of Plaintiff's complaint regarding Foglietta. ¶¶62-63. Foglietta was not fired, removed, or made to resign during Plaintiff's years at Poly. Instead, he remained employed there for over a decade. ¶¶64, 66. Foglietta's abuse of Plaintiff continued even after Plaintiff reported his abuse. ¶67.

As noted, Foglietta's sexual abuse of minors was not limited to Plaintiff. ¶68. A lawsuit was brought in this Court by multiple students against Poly alleging that they were abused by Foglietta over the course of approximately two decades, and that Foglietta's abuse was fraudulently concealed by Poly despite numerous reports alerting the school to Foglietta's inappropriate behavior. ¶¶82-85.

Poly had ample notice that Foglietta posed a danger to minors before his abuse of Plaintiff began in the late 1970s. As early as 1966, an eighth grade Poly student William Jackson accompanied by his parents accused Foglietta of repeated sexual abuse, providing graphic details, when speaking with then Headmaster Scull and Athletic Director Harlow Parker. ¶¶85-87. A sham investigation followed in which Poly failed to memorialize the meeting or the supposed investigation, and told Jackson that he would face severe consequences if he persisted in accusing Foglietta of sexual misconduct. ¶¶88-89.

On information and belief, upon assuming the role of headmaster in 1970, Defendant Williams was told of Jackson's complaints. ¶91. Then, in 1972 when Williams was Poly's headmaster, Foglietta tried to sexually abuse another student, this time a Poly freshman, John

Marino. ¶92. After Marino rebuffed his advances, Foglietta physically, verbally, and emotionally abused Marino until Marino graduated in 1976. ¶¶93-94.

Marino also witnessed Foglietta's sexually abusing other boys on or near Poly grounds on at least ten occasions. ¶95. Yet, when Marino and his parents met with Williams and Poly Athletic Director Parker in 1973, and accused Foglietta of "fooling around with boys" in Foglietta's car, Williams and Parker refused to credit the report. They told Marino's parents that their son had started false rumors, called Marino a troublemaker, and threatened to expel him if he made further accusations. ¶¶96-99. Defendants neither memorialized Marino's complaint nor commenced an investigation in response. ¶¶101-02.

Marino and his parents had a second meeting with Defendant Williams and Parker in 1974, at which Marino once again accused Foglietta of sexually abusing male students. ¶¶103-04. On information and belief, both Marino and his father reported that they had witnessed Foglietta's sexually abusing a child at Poly. ¶105. Once again, Defendants did not fire or otherwise remove Foglietta. Marino was, once again, threatened with expulsion. ¶¶106-07.

On information and belief, prior to and/or by the time of Plaintiff's abuse by Foglietta, Defendant Novello had been advised of reports of Foglietta's sexually abusing students. ¶110. Defendant Williams has even admitted under oath that he believed that he discussed Marino's accusations with Parker or Novello. ¶109. Yet, on information and belief, Defendant Novello did not take steps to promote an investigation of Foglietta prior to or during Plaintiff's years at Poly in the late 1970s and early 1980s. ¶111. Nor did Novello not advocate for Foglietta's disciplining, removal, or firing prior to or during Plaintiff's years at Poly. ¶112. Instead, on information and belief none of the Defendants warned students, their parents, legal authorities, or

the general public that Foglietta posed a risk of sexually abusing minor prior to or during Plaintiff's years at Poly. ¶113.

Defendants also received written warnings about Foglietta. In the mid-1970s, Williams received anonymous letters that warned: "You need to know that Mr. Foglietta is doing terrible things to your students." ¶114. While Williams later claimed to have been concerned by the letters, his response at the time was merely to show one of them to Foglietta and say, "If I find out that you are doing something that's abusing kids in any way, and I observe it, then — and you're not telling me now, then I'll fire you then." ¶¶115-16. Williams later claimed to have discarded the letters based on a fear that they could damage Foglietta's reputation, and a view that "unsigned complaints should be tossed," and conducted no contemporaneous investigation into the allegations. ¶¶118-19. This despite the fact that Williams surely understood the letters to be containing accusations of sexual abuse by Foglietta, as reflected in his subsequent description of the letters as having been "from a parent accusing Coach Foglietta of molesting students." ¶¶121-24.

Approximately one year after receiving those letters, Defendant Williams also received an anonymous phone call in which the caller utilized language similar to that found in the letters, such as: "he [is] doing terrible things to our kids." ¶125. Defendants did not contemporaneously memorialize the 1970s telephone call, nor did they conduct a contemporaneous investigation, discipline, or fire Foglietta. ¶¶128-29.

A plaintiff called John Doe II also alleged in an earlier suit in this District that in 1972 or 1973, he told Robert Foreman, a Poly administrator, that Foglietta was inappropriately grabbing boys. ¶131. John Doe II further alleged that Athletic Director Parker saw him being abused by Foglietta in the boys' showers. ¶132.

In short, while the Complaint alleges that Defendants "knew or should have known" about Foglietta's abusive and unlawful behavior it clearly does not stop there. ¶136. The allegations summarized above describe specific detailed circumstances and events that placed Defendants on notice of Foglietta's inappropriate behavior towards students in the years leading up to and including Plaintiff's abuse. ¶134. Reports by Marino and his parents, Jackson, and John Doe II all occurred before Plaintiff's abuse at Poly. They placed Defendants on notice that Foglietta was abusing minors at Poly, but were improperly ignored. ¶135. That pattern is entirely consistent with Plaintiff's reporting his own abuse to a teacher at Poly in approximately 1979-80, and Defendants, once again, failing to respond appropriately. ¶¶61-66.

Had Defendants fired Foglietta, asked him to resign, or reported him for criminal investigation prior to Plaintiff's enrollment at Poly, Plaintiff would never have been abused. ¶137. Yet, Defendants consistently dismissed warnings and failed to conduct a proper investigation, resulting in extensive criminal abuse. On information and belief, the Poly students who suffered abuse due to Defendants' negligence, recklessness, and gross misconduct included James Zimmerman, who attended Poly from seventh grade until graduating in 1982; George Zarou, who attended Poly from 1968 until 1972; Philip Culhane, who attended Poly from fifth grade until graduating in 1984; John Doe II, who started at POLY as a fifth grader in 1968, attended until his sophomore year in 1974; John Doe III, who alleged that from 1968-1972 he was sexually abused by Foglietta including on school grounds approximately twice per week; John Doe IV, who attended Poly from 1970 until 1974; David Hiltbrand, who was another victim of repeated abuse by Foglietta in 1966; and John Paggioli, who claimed repeated sexual abuse by Foglietta between 1970 and 1974. ¶¶138, 187.

Defendant Williams has acknowledged that although he considered firing Foglietta, he was worried about litigation by Foglietta and about how alumni might react to the news. ¶139. Williams also admitted that he disposed of certain documents containing allegations of abuse by Foglietta, and could not articulate why he destroyed these documents. ¶¶140-41.

Only in 1991 was a decision made at Poly to not renew Foglietta's contract. ¶142. The reason for that decision was that Poly had received credible allegations, which Defendant Williams believed, that Foglietta had sexually abused a former student, Hiltbrand. ¶¶145, 147. Yet, even then, Williams did not go to the authorities regarding the accusations, nor did he make a public statement or disclose accusations of abuse by Foglietta to Poly's alumni. ¶¶146, 148.

Rather than report Foglietta to legal authorities, following Foglietta's retirement in 1991, a Poly alumni event was hosted in Foglietta's honor at the Downtown Athletic Club. ¶149. After Foglietta died in approximately 1998, Poly even established the Philip A. Foglietta Memorial Fund in his honor. ¶¶151-52. Poly solicited contributions for a fund in Foglietta's name. ¶153.

In 2000, David Harman assumed the position of headmaster at Poly Prep. ¶154. In May 2002, Harman received a letter from David A. Berger, Esq. ("Berger"), an attorney, reiterating the accusations that Hiltbrand had made in his letter to Williams in 1991. ¶155. Harman responded to Berger that he had notified the Board of Berger's letter. ¶156. Harman also indicated that Hiltbrand's earlier letter, along with two anonymous letters received when Williams was headmaster, were the only allegations of abuse that Poly had ever received. ¶157.

As related above, that was inaccurate, since multiple students including Marino, Jackson, John Doe II, and Plaintiff had reported Foglietta's inappropriate and unlawful behavior to Poly administrators and employees. ¶158. Defendants had ample notice that Foglietta posed a risk to minor students prior to, at the time of, and after the time when Plaintiff was attending Poly. ¶159.

Nonetheless, and although Defendants owed a duty of care to keep students safe from abuse, they affirmatively and/or impliedly represented to children, their families, and the public that employees at Poly, including Foglietta, posed no risk of abusing children, and that children would be safe in their care. ¶¶174, 176. Defendants carelessly, negligently, recklessly, willfully, and intentionally failed to have in place an appropriate policy and/or practice for making hiring, assignment, and retention decisions, so as to protect vulnerable students in their care from sexual abuse. ¶178. Nor did Defendants have in place an appropriate policy and/or practice to monitor, supervise, or oversee staff including Foglietta's interactions with minor students such as Plaintiff, to keep them safe from abuse. ¶179. In sum, Defendants displayed utter disregard as to the potential profound injuries that would foreseeably ensue, and acted with depraved indifference to the well-being of children. ¶181. On information and belief, Defendants' pattern of denial, sham investigations, failure to perform thorough investigations, and whitewashing Foglietta's conduct would support a finding of fraudulent concealment such as to toll the statute of limitations, even if the timeliness of claims such as Plaintiff's claim had not been revived by the Child Victim's Act. ¶73.[4]

This action was commenced in August 2020. In October 2020, after the Complaint was served, Defendants sought an extension of time to answer. Docket 11. A pre-motion conference was held by Judge Garaufis, at which Defendants argued that the CVA violated New York's Constitution. Plaintiff explained that such arguments had failed many times. When the Court asked, Defendants admitted that they knew of no occasions when such a challenge succeeded.

## **STANDARD OF REVIEW**

---

[4] On that topic, *see Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317 (E.D.N.Y. 2012) (pre-CVA action alleging fraud and suppression of information concerning Foglietta's abuse by Defendants including Poly).

Courts facing motions under Fed. R. Civ. P. 12(b)(6) accept allegations as true, drawing all reasonable inferences in the plaintiff's favor. *Brown Media Corp. v. K&L Gates, LLP,* 854 F.3d 150, 156-157 (2d Cir. 2017) (citations omitted). A complaint must include sufficient factual matter "'to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))). Claims are facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"The question on a motion to dismiss 'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Brown v Netflix, Inc.*, 462 F. Supp 3d 453, 458-459 (S.D.N.Y. 2020), *quoting Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (internal citations omitted). "'[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits' or 'weigh[ing] the evidence that might be offered to support it.'" *Id.*, *quoting Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal citations omitted).

## <u>ARGUMENT</u>

## I. <u>DEFENDANTS' MERITLESS CHALLENGE TO THE CVA UNDER NEW YORK STATE'S CONSTITUTION HAS BEEN RIGHTLY REJECTED BY FEDERAL AND STATE COURTS[5]</u>

### A. As Magistrate Bulsara Recognized, Jurists Have Repeatedly Rejected New York State Constitutional Challenges to the CVA, which are "Without Merit"

---

[5] In a footnote (Dkt. 15-1, p.7, n.3), Defendants state that they do "not concede" that the CVA comports with the United States Constitution. Had Defendants actually moved to dismiss under the United States Constitution, Plaintiffs would have explained why such an argument is unavailing. Since Defendants chose not to, and only advanced a state challenge, they certainly should not be heard to raise such an argument for the first time on reply.

Defendants moved for a partial stay of discovery in this case pending their motion to dismiss. In support of a stay, they argued that "substantial defenses raised by the Defendants in their pending motion to dismiss that, if successful, will result in the action being dismissed in its entire[t]y on constitutional grounds[.]" Dkt. 21-6. In other words, Defendants were arguing that the Child Victim's Act's revival of civil claims violates New York's Constitution.

Magistrate Bulsara was rightly unpersuaded. *See* Dkt. #24. As he recognized, while multiple courts have been rejected that constitutional argument, Defendants "cannot cite to a case to the contrary." *Id.* at p.2. Magistrate Bulsara rejected Defendants' challenge as "without merit," explaining that "'[t]he New York Courts' historical skepticism of claim-revival provisions appears to be just that: historical.'" *Id.*, *quoting Giuffre v. Dershowitz*, No. 19-CV-3377, 2020 U.S. Dist. LEXIS 78596, at *5 (S.D.N.Y. Apr. 8, 2020).

His analysis was correct. New York's courts have repeatedly upheld the Legislature's revival of time-barred claims where, as here, the Legislature's intent is expressly stated and permitting such claims would do justice to deserving parties. Under these long-standing precedents, the revival of childhood sexual abuse claims comports with due process.

For instance, Judge Preska rejected such a challenge to the CVA in *Giuffre*. She explained that "the New York Court of Appeals has recently enunciated the permissive stance that a given revival statute will not run afoul of New York's due process clause if it merely 'was a reasonable measure to address an injustice.'" *Id., quoting Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig*., 30 N.Y.3d 377, 400 (2017). As Judge Preska recognized, the CVA's claim-revival provision "obviously reflects the New York State Legislature's desire to correct a perceived injustice, *i.e.*, that the statute of limitations for certain claims expired before child victims of sexual abuse recovered from past traumas to a degree sufficient to assert their

rights." *Id.* at *6. She concluded that "the Court is unable to see how the CVA's claim-revival provision fails to meet the manageable bar set forth in the World Trade Center litigation." *Id.*

Consistent with *Giuffre*, New York's courts have consistently rejected challenges to the CVA's constitutionality. Examples include:

- **Ex. B** (*Ark3*), at p.12 (Jaeger, J. holding that "the Child Victims Act is a reasonable response to remedy the injustice of past child sexual abuse. Accordingly, it does not violate Defendant['s] right to due process under the New York State Constitution and that branch of the Motion to Dismiss is DENIED.");

- **Ex. C** (*Torrey*), at pp.9-10 (Chimes, J. holding that "the Child Victims Act [is] a reasonable response to remedy an injustice" and that it does not "violate [the defendant's] right to due process under the New York State Constitution");

- **Ex. D** (*Werner*), pp.5-6 (Jaeger, J. holding that "[b]ased on this legislative history, the Court finds the Child Victims Act is a reasonable response to remedy the injustice of past child sexual abuse. Accordingly, it does not violate Defendant['s] right to due process under the New York State Constitution[.]");

- **Ex. E** (*Dolgas*), pp.2-4 (Mackey, J. holding that "[t]he court finds that the claim-revival provision of the Child Victims Act was a reasonable response to remedy an injustice clearly identified and articulated by the Legislature. As such, it does not violate Tri-Valley's right to due process under the New York State Constitution and its motion to dismiss the complaint as time-barred is, therefore, denied").

For the reasons that follow, those decisions were correctly decided and Defendants' constitutional challenge is entirely devoid of merit.[6]

---

[6] In those decisions, New York courts rejected arguments that reviving claims of abuse victims is "unfair" because the defendants relied on the statute of limitations and evidence may have been lost. If anything, such arguments are even less compelling in Poly's case than they might be elsewhere. First, as discussed *supra*, Foglietta's abuse continued for decades, affecting many children, numbers of whom have come forward. Indeed, several were listed by Plaintiff in his Complaint. Thus, numerous witnesses exist with knowledge of Foglietta's abuse. Second, his abuse of minors at Poly already was the subject of considerable litigation in this District approximately a decade ago, in which numerous depositions were taken of Poly employees. *See, e.g., Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317 (E.D.N.Y. 2012); *Zimmerman v. Poly Prep Country Day Sch.,* 2011 U.S. Dist. LEXIS 40704 (E.D.N.Y. Apr. 13, 2011). This undermines any suggestion by Defendants that evidence does not exist. Third, as the Complaint reflects, Defendants had ample notice that Foglietta was an abuser, but Poly and its employees

### B. The Pertinent Legal Standard

Legislative enactments are entitled to a strong presumption of constitutionality. *Dalton v. Pataki*, 5 N.Y.3d 243, 255 (2005). "'While the presumption is not irrefutable, parties challenging a duly enacted statute face the initial burden of demonstrating the statutes invalidity beyond a reasonable doubt.'" *Id.* (*quoting LaValle v. Hayden*, 98 N.Y.2d 155, 161 (2002) (internal citations omitted)). In considering the constitutionality of the CVA, "courts must avoid, if possible, interpreting a presumptively valid statute in a way that will needlessly render it unconstitutional." *LaValle*, 98 N.Y.2d at 161. "[A] claim-revival statute will satisfy the Due Process Clause of the State constitution if it was enacted as a reasonable response in order to remedy an injustice." *In Re Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig*., 30 N.Y.3d 377, 394-400 (2017). This standard is only "slightly more demanding than pure reasonableness." *Id.* at 399.

Defendants erroneously suggest that New York's Court of Appeals has interpreted the State Constitution's Due Process Clause to allow for revival of time-barred claims only in exceptional circumstances where claimants were previously prevented in some specific manner from asserting claims. That is a mischaracterization of New York law and invites error. There is no "exceptional circumstances" requirement, nor is there any rule that claimants must have been previously unable to bring claims. Again, the standard for reviewing claims-revival statutes like the CVA was clearly laid out by the Court of Appeals: "a claim-revival statute will satisfy the Due Process Clause of the State constitution if it was enacted as a reasonable response in order to

---

chose to discard evidence. Indeed, in the *Zimmerman* litigation, Judge Pollack found "that plaintiffs ha[d] met all three prongs of the spoliation test" and sanctioned Poly for its failure to preserve evidence. *See Zimmerman v. Poly Prep Country Day Sch.,* 2011 U.S. Dist. LEXIS 40704, at *104 (E.D.N.Y. Apr. 13, 2011). Having been sanctioned for failure to preserve evidence, Defendants are hardly in a position to complain that they have been prejudiced that evidence is no longer available.

remedy an injustice." *Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 30 N.Y.3d at 400.

When evaluated against the correct standard, the Legislature's revival of claims for child sexual abuse under CPLR § 214-g is clearly constitutional. It is a reasonable response:  a short, limited revival, enacted to remedy an injustice—the inability of thousands of child sex abuse survivors to bring timely actions because of the psychological scars they bear.

### C. The Cases on which Defendants Rely Do Not Support Their Argument

Because the legal standard may be important for the Court's evaluation of Defendants' constitutionality challenge, Plaintiff feels compelled to respond to the argument in Defendants' memorandum. It muddles an otherwise clear standard laid out by the Court of Appeals in *Matter of World Trade Center*. Indeed, before that decision, the Second Circuit was confronted with this very question and found the New York precedent to be inconsistent. This led the Second Circuit to certify the following question to the New York Court of Appeals: "Does the 'serious injustice' standard articulated in *Gallewski v. H. Hentz & Co.*, 301 N.Y. 164, 174, 93 N.E.2d 620 (1950), or the less stringent 'reasonableness' standard articulated in *Robinson v. Robins Dry Dock & Repair Co.*, 238 N.Y. 271, 144 N.E. 579 (1924), govern the merits of a due process challenge under the New York State Constitution to a claim-revival statute?" *Matter of World Trade Ctr.*, 30 N.Y.3d at 381.

As discussed below, the answer that New York's Court of Appeals gave (which governs here), was that there is no difference between the standards. It rejected the interpretation proposed by Defendant here as a misreading of the law.

### 1. *Robinson v. Robins Dry Dock & Repair Co.*

The first case, *Robinson*, 238 N.Y. 271 (1924), involved a claims-revival statute where injured workers faced a limitations bar after they had pursued workers' compensation benefits under a system later invalidated by the Supreme Court. The Court of Appeals upheld a statute reviving the workers' legal claims for one year. *Id.* at 274-76. It observed that applying the original limitations period would "deprive a plaintiff without fault of a cause of action," and concluded that extending the limitations period was "no arbitrary deprivation" of rights but rather was a "reasonable" response to a situation that "reasonably call[ed] for remedy." *Id.* at 279-280.

*Robinson* set the standard that would be applied by the Court of Appeals before its decision synthesizing those holdings in *Matter of World Trade Ctr. See Gallewski v. H. Hentz & Co.*, 301 N.Y. 164 (1950); *McCann v. Walsh Const. Co.*, 123 N.Y.S.2d 509 (1953), *aff'd without op.*, 306 N.Y. 904 (1954); *Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487 (1990). In each case, the Court of Appeals upheld the challenged claim-revival statute as constitutional under this deferential standard.

### 2. *Gallewski v. H. Hentz & Co.*

The Second Circuit's earlier uncertainty regarding New York's due process analysis for claims-revival statutes arose out of the decision in *Gallewski v. H. Hentz & Co.*, 301 N.Y. 164 (1950). In *Gallewski*, the heirs of a man brought a claim against a brokerage firm for selling his securities without his permission, even though the period of limitations for bringing the claim technically lapsed while the man was in Nazi-occupied territory and a concentration camp. *Id.* at 168. The Court of Appeals followed *Robinson*, writing "[h]ere, as in the *Robinson* case, the

'extension of time to bring action was reasonable and this exercise of the legislative power should not be declared invalid because of a constitutional limitation of doubtful application." *Id.* at 175. The Court offered a reading of *Robinson* that allowed a claims-revival statute in the setting of the "exceptional" circumstances to remedy the "serious injustice" before it with a theft from a man while he was in a concentration camp: "The case may be read, we think, as holding that the Legislature *may* constitutionally revive a personal cause of action where the circumstances are exceptional and are such as to satisfy the court that serious injustice would result to plaintiffs not guilty of any fault if the intention of the Legislature were not effectuated." *Id.* at 174 (emphasis added). Insofar as Defendants suggest that this language sets a minimum showing and the standard with which claims-revival statutes must be assessed, they are wrong. That argument was directly addressed and rejected by the New York Court of Appeals in *World Trade Center.*

### 3. The New York Court of Appeals rejected Defendant's Due Process Argument in *Matter of World Trade Ctr.*

With the certified question from the Second Circuit, the New York Court of Appeals examined each of these cases closely, explaining that *Robinson* and *Gallewski* were not, in fact, inconsistent. *Matter of World Trade Ctr.*, 30 N.Y.3d at 399. It explained that the District Court had incorrectly found Jimmy Nolan's law unconstitutional on the grounds that it was not passed in response to exceptional circumstances or a serious injustice, exactly what Defendants are asking the Court to do. *Id.* at 383, 399. The New York Court of Appeals explained that Defendants' erroneous interpretation was based on a misreading of *Gallewski* and that the proper standard is whether a claim-revival statute was reasonable:

A close reading of *Gallewski* reveals that it did not overrule or narrow *Robinson*. To the contrary, it expressly reaffirmed the *Robinson* standard (*see* 301 N.Y. at 175 ["Here, as in the *Robinson* case, the 'extension of the time to bring . . . action was reasonable'"]). By elaborating that "[*Robinson*] may be read . . . as holding that the Legislature may constitutionally revive a personal cause of action where the circumstances are exceptional and . . . serious injustice would result to plaintiffs not guilty of any fault" (*id.* at 174), the Court was describing the particular circumstances of the case before it, providing additional color on *Robinson* and concluding that the extraordinary events of World War II more than satisfied the test. Any purported dichotomy between *Robinson's* and *Gallewski's* holdings is illusory.

*Matter of World Trade Ctr.*, 30 N.Y.3d at 399.

After clarifying that New York courts must simply decide whether a revival statute "was a reasonable measure to address an injustice," the Court explained that any higher standard "would be too strict" and that the "moral determinations" needed to decide whether a particular injustice deserves a remedy through a revival statute are "left to the elected branches of government":

A more heightened standard would be too strict. In the context of a claim-revival statute, there is no principled way for a court to test whether a particular injustice is "serious" or whether a particular class of plaintiffs is blameless; such moral determinations are left to the elected branches of government. While we have traditionally expressed an aversion to retroactive legislation, of which claim-revival statutes are one species, we have noted that the modern cases reflect a less rigid view of the Legislature's right to pass such legislation. Nonetheless, there must first be a judicial determination that the revival statute was a reasonable measure to address an injustice.

*Id.* at 400 (citations and quotations omitted). Simply put, Defendant's constitutional argument has been rejected by the Court of Appeals and has no merit.

**4. *Zumpano v. Quinn* has nothing to do with the issue before the Court except to support the policies underlying the CVA.**

*Zumpano v. Quinn*, 6 N.Y.3d 666 (2006), also offers no basis for dismissal. Indeed, it is unhelpful to this analysis, except in the sense that in deciding it, the Court of Appeals suggested a law like the CVA constituted good policy. In *Zumpano*, the plaintiffs were victims of childhood sexual abuse by clergy, but the CVA had not yet been passed. *Id.* at 671-673. The plaintiffs offered arguments as to why the statute of limitations under the law at the time would not bar the claims, but ultimately the Court of Appeals upheld the dismissal of the claims under the statute of limitations. *Id.* at 673-677. In so holding, however, the Court of Appeals appealed to the Legislature to do something about it "as other states have done":

> We conclude as we began: however reprehensible the conduct alleged, these actions are subject to the time limits created by the Legislature. Any exception to be made to allow these types of claims to proceed outside of the applicable statutes of limitations would be for the Legislature, as other states have done.

*Id.* at 677.

*Zumpano*, which predates *Matter of World Trade Ctr.*, tells us nothing about whether the CVA is constitutional other than the *dicta* suggesting that the Court of Appeals would approve of a legislative window allowing such claims to go forward would be a reasonable response by the Legislature to remedy an injustice, counseling in favor of the CVA's constitutionality.[7]

**D. The CVA is a Reasonable Response to Remedy Injustice, Protect Children, and Restore Justice to Thousands of Abuse Survivors**

---

[7] Defendants' reliance on *Matter of Regina Metro. Co., LLC v NY State Div. of Hous. & Community Renewal,* 35 N.Y.3d 332 (2020), is also misplaced. *Regina* was addressing the proper method for calculating the recoverable rent overcharge for New York City apartments. *See id.* at 348. It is clearly inapt. The Court's holding that overcharge calculation provisions of would not to be applied retroactively was guided *inter alia* by its view that legislative intent was unclear there, and that "[w]hen the Legislature has intended to revive time-barred claims, it has typically said so unambiguously, providing a limited window when stale claims may be pursued." *Id.* at 371. In contrast, the CVA leaves no doubt that New York's Legislature intended to revive claims such as Plaintiff's.

In reference to the standard for claims-revival statutes in *Matter of World Trade Ctr.*, the CVA is constitutional as it is truly a reasonable response to remedy an injustice. The legislation was primarily intended to revive civil claims by survivors of childhood sexual abuse that were time-barred under the existing statute of limitations, and to provide a more generous statute of limitations for such claims in the future. Vincent C. Alexander, Practice Commentaries, MCKINNEY'S CPLR §214-G. Many other states have passed similar legislation and many other courts have upheld those laws under similar due process standards.

The "Justification" for the Senate Bill that became the CVA reflects an intent remedy a great injustice to abuse survivors in recognition of the widely accepted scientific evidence that has found victims of childhood sexual abuse are often unable to understand their injuries or take meaningful action against the responsible parties until many years into their adult lives. The Sponsor's Memorandum explained that New York was "one of the worst states in the nation" on this issue and "thousands of survivors" were left unable to pursue redress for their injuries:

> New York is one of the worst states in the nation for survivors of child sexual abuse. New York currently requires most survivors to file civil actions or criminal charges against their abusers by the age of 23 at most, long before most survivors report or come to terms with their abuse, which has been estimated to be as high as 52 years old on average. Because of these restrictive statutes of limitations, thousands of survivors are unable to sue or press charges against their abusers, who remain hidden from law enforcement and pose a persistent threat to public safety.
>
> This legislation would open the doors of justice to the thousands of survivors of child sexual abuse in New York State by prospectively extending the statute of limitations to age 28 for charging felony sexual offenses, age 25 for charging misdemeanor sexual offenses, and age 55 for bringing civil actions for physical, psychological or other injury suffered as a result of child sexual abuse against any party whose intentional or negligent acts or omissions are alleged to have resulted in the abuse.

> This legislation would also establish a one-year window in which adult survivors of child sexual abuse would be permitted to file civil actions, even if the statute of limitations had already expired or, in the case of civil actions against public institutions, a notice of claim requirement had gone unmet.
>
> Passage of the Child Victims Act will finally allow justice for past and future survivors of child sexual abuse, help the public identify hidden child predators through civil litigation discovery, and shift the significant and lasting costs of child sexual abuse to the responsible parties.

Vincent C. Alexander, Practice Commentaries, MCKINNEY'S CPLR §214-G (quoting Sponsor's Memorandum to Chapter 11 of the Laws of 2019), *see* https://www.nysenate.gov/legislation/bills/2019/S2440 (last visited March 2, 2020). The Sponsor's Memorandum accompanying the legislation noted that "[t]he societal plague of sexual abuse against minors is ... well documented," as is the fact that the crimes of many abusers have been covered up by the institutions that employed them. *Id*. The Memorandum goes on to reference the Court of Appeals decision in *Zumpano* as part of the basis for the Act. *Id*.

Now, with the passage of the CVA, New York joins many states across the country that have amended their statutes of limitations in recent years to comport with the scientific evidence, restore justice to countless abuse survivors, and better protect children by expanding the time for survivors to bring civil claims, including "window legislation" that allows survivors with time-barred claims a limited time period to file lawsuits against the perpetrators who abused them and the institutions responsible for their abuse.[8]

---

[8] *See, e.g.*, N.J. Stat. Ann. § 2A:14-2b (New Jersey adding a discovery rule and two-year window for time-barred claims); Conn. Gen. Stat. Ann. § 52-577d (Connecticut, retroactively increased statute of limitations to age 51, including for time-barred claims); Cal. Civ. Proc. Code § 340.1 (California, increased its statute of limitations to age 40, plus discovery rule and a three year window for time-barred claims); Minn. Stat. Ann. § 541.073 (Minnesota, increased its statute of limitations to age 24); Haw. Rev. Stat. Ann. § 657-1.8 (Hawaii, increased its statute of limitations to age 26, plus discovery rule and eight-year window for time-barred claims); Mont. Code Ann. § 27-2-216 (Montana, increased its statute of limitations to age 27, plus discovery rule and one-year window for time barred claims); D.C. Code Ann. § 12-301 (Washington, D.C., increased its statute of limitations to age 40, plus discovery

Other courts have considered the constitutionality of similar revival legislation in the context of childhood sexual abuse and upheld the revivals to be a proper exercise of legislative judgment under their state constitutions. *See, e.g., Doe v. Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 405 (2015) (upholding constitutionality of retroactive application of statutory amendment increasing to thirty years statute of limitations applicable to civil actions for child abuse and "concluding that the application of § 52–577d retroactively to revive a time barred cause of action does not violate a defendant's substantive due process rights under the Connecticut constitution because it is a rational response by the legislature to the exceptional circumstances and potential for injustice faced by adults who fell victim to sexual abuse as a child."); *Deutsch v. Masonic Homes of Cal., Inc.*, 164 Cal.App.4th 748, 752-759 (Cal.Ct.App.2008) (upholding constitutionality of statute extending statute of limitations from one to eight years and creating window for revival of otherwise time-barred claims arising out of childhood sexual abuse); *Sheehan v. Oblates of St. Francis de Sales*, 15 A.3d 1247, 1258–1260 (Del. 2011) (upholding constitutionality of statute creating window for revived claims of childhood sexual abuse); *Cosgriffe v. Cosgriffe*, 262 Mont. 175, 180 (1993) (allowing plaintiff to bring claims for childhood sexual abuse within three years of discovering that the injuries were allegedly caused by the abuse and holding that "[t]here are no constitutional or statutory obstacles to legislative enactments of statutes relating to remedies that are retroactive in operation"); *Stratmeyer v. Stratmeyer*, 1997 S.D. 97, ¶ 18 (1997) ("Since the Legislature decided that special protection was necessary for vindication of victims of sexual abuse in the future, it is

---

rule); Vt. Stat. Ann. tit. 12, § 522 (Vermont, retroactively abolished its statute of limitations and window never expires for time-barred claims); Ariz. Rev. Stat. Ann. § 12-514 (Arizona, increased its statute of limitations to age 30); and Del. Code tit. 10, §8145 (Delaware, eliminated its civil statute of limitations, plus two year window for time barred claims).

consistent that it would afford greater protection for acts occurring in the past as well, rather than adhering to a three-year occurrence rule previously provided under [South Dakota laws].").

### E. Without the CVA, There Would Be Tremendous Injustice As Many Survivors Are Incapable of Seeking Help or Taking Legal Action For Years into Their Adult Lives.

Further support for the conclusion that the CVA is a reasonable response to remedy an injustice lies in the modern psychological evidence that increasingly recognizes how survivors of childhood sexual abuse suffer severe psychological injuries are unable to be fully recognized for months, years, and even decades. *See* David Viens, Countdown to Injustice: The Irrational Application of Criminal Statutes of Limitations to Sexual Offenses Against Children, 38 SUFFOLK U. L. REV. 169, 176 (2004) (describing effects of childhood sexual abuse).

In order to survive the sexual abuse, particularly when perpetrated by a trusted figure, survivors of sexual abuse develop psychological armor to survive the experience, repression, denial and emotional avoidance. "As a result, the symptoms of childhood sexual abuse may lie dormant for days or decades until detonated by a 'developmental trigger' or therapy itself." Rebecca L. Thomas, *Adult Survivors of Childhood Sexual Abuse and Statutes of Limitations. a Call for Legislative Action*, 26 WAKE FOREST L. REV. 1245, 1254 (1991). It is not unusual for survivors of childhood sexual abuse to go decades before confronting the compartmentalized abuse and its effect in their lives. *Id.* ("[O]ne study of 365 adult survivors found that, on the average, survivors entered therapy 17 years after the abuse terminated.").

Compounding defense mechanisms is the fact that children typically do not disclose sexual abuse during or immediately after the time they are abused. Ramona Alaggia, *Many Ways of Telling: Expanding Conceptualizations of Child Sexual Abuse Disclosure*, 28 CHILD ABUSE & NEGLECT 1213, 1218 (2004) (58% of child sexual abuse victims did not purposefully

disclose their abuse until adulthood). The pressures to remain silent are wide-ranging and often overwhelming, including pressure or threats from the perpetrator, a relationship with the perpetrator, fear of the anticipated consequences of telling, fear of negative reactions from parents or family, fear of not being believed, and feelings of embarrassment, shame, and self-blame. *Id.*

Given the extensive scientific research, it should come as little surprise that, for more than 30 years, courts around the country have recognized the unique and insidious nature of child sexual abuse injuries that prevent survivors from being able to take action against those responsible for the abuse for many years into their adult lives. *See, e.g., Evans v. Eckelman*, 265 Cal. Rptr. 605 (1990) (oldest child's "psychological blocking mechanisms" broke down when he was convicted of sexual assault and ordered to undergo therapy); *K.E. v. Hoffman*, 452 N.W.2d 509, 511 (Minn. 1990) (memories of sexual abuse resurfaced while adult survivor was serving in Army); *Meiers-Post v. Schafer*, 427 N.W.2d 606 (Mich. Ct. App. 1988) (adult's repression of sexual relations with high school teacher unearthed while watching television show on sexual exploitation of students by teacher); *Hammer v. Hammer*, 418 N.W.2d 23 (Wis. Ct. App. 1987) (applying discovery rule in case of incestuous abuse where victim had developed denial and suppression coping mechanisms); *Jasmin v. Ross*, 177 Or. App. 210, 212-13 (Or. Ct. App. 2001) (recognition of injury from abuse by step-uncle triggered by discussions with high school confidant years from the last incident of sexual contact); *Korst v. McMahon*, 136 Wash. App. 202, 206-10 (2006) ("the victim of childhood sexual abuse may be unable to understand or make the connection between childhood sexual abuse and emotional harm or damage until many years after the abuse occurs."); *Roberts v. Caton*, 224 Conn. 483, 493-94 (1993) (the legislative purpose of a revival statue relating to childhood sexual abuse is "to afford a plaintiff sufficient

time to recall and come to terms with traumatic childhood events"); *Sliney v. Previte*, 473 Mass. 283, 292 (2015) ("The purpose of the act, as reflected in its preamble, and reinforced by legislative history, is to preserve public safety and protect children who have been abused by enabling them to seek a remedy for severe injuries that they did not appreciate for long periods of time due to the abuse.").

One court has made a powerful analogy comparing the delayed impact from childhood sexual abuse to latent illnesses:

> Imagine being pricked on the arm with a pin. At first, such an intrusion would be disturbing, but with time might seem uneventful. Now imagine the pin carried a dreaded affliction, only discoverable after years of incubation. Such is often the nature of childhood sexual abuse. Many children only realize years later the true significance of the abuse they endured, especially in cases where the molestation occurred at the hands of family members or other trusted individuals. For some children, sexual violation is so traumatic it becomes psychologically self-concealing, if only to preserve sanity.

*Stratmeyer v. Stratmeyer*, 1997 S.D. 97, ¶ 13 (1997).

Indeed, this public policy objective finds support from numerous commentators. See, e.g., Ann Marie Hagen, Note, *Tolling the Statute of Limitations for Adult Survivors of Childhood Sexual Abuse*, 76 IOWA L. REV. 355 (1991) (calling for statutory reform and pointing out that adult survivors of child sexual abuse are "blamelessly unaware" of their injuries and should not be re-victimized by allowing their abuser to hide behind a statute of limitation). Professor Marci Hamilton observes:

> Legislation that eliminates the civil [statute of limitations] or includes a discovery rule is supported by various studies on the long-term effects of child molestation and the likely delay in disclosure. . . . As clinician Mic Hunter has observed: "Some of the effects of sexual abuse do not become apparent until the victim is an adult and a major life event, such as marriage or birth of a child,

takes place. Therefore, a child who seemed unharmed by childhood abuse can develop crippling symptoms years later . . . ."

M. Hamilton, *The Time Has Come for a Restatement of Child Sex Abuse*, 79 BROOK. L.REV. 397, 404-405 (2014) (citations omitted).

The Legislature, in passing the CVA, was responding to the tremendous injustices created by a short limitation period for claims arising out of sexual abuse incorporating all of the above factors. As the cases cited *supra* have consistently recognized, its decision to open a limited window of time to bring claims is a reasonable response to remedy that injustice. Thus, Defendants' constitutional challenge lacks merit and must be denied.


## II.   AS DEFENDANTS ESSENTIALLY CONCEDE, PLAINTIFF'S FIRST CAUSE OF ACTION IS PROPERLY PLED AND STATES A VIABLE CLAIM

Defendants do not seriously dispute that the Complaint first Count states a viable claim under New York law. That makes sense as such claims are clearly allowed in New York.

For instance, in *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159, 161 (2nd Dept 1997)*,* the minor plaintiffs alleged they were sexually abused by a priest while he was serving within the Diocese of Brooklyn. New York's Appellate Division held that "an employer can . . . be held liable under theories of negligent hiring, negligent retention, and negligent supervision" if it "knew or should have known of the employee's propensity for the conduct which caused the injury." *Id.* The Court added that there is "no statutory requirement that causes of action sounding in negligent hiring, negligent retention, or negligent supervision be pleaded with specificity." *Id.* at 162. *See also Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 335 (E.D.N.Y. 2012) ("Under New York law, plaintiffs can sue Foglietta's employer,

Poly Prep, for negligent retention or supervision if it knew or should have known of Foglietta's propensity for the conduct which caused [their] injury.") (citations and quotations omitted).

In this case, the Complaint alleges that Foglietta was a serial predator, abusing multiple children at Poly for decades. ¶69. As related above, it describes how Defendants knew or should have known of his inappropriate conduct in the years leading up to Plaintiff's abuse, describes multiple oral and written reports concerning Foglietta's misconduct from students and parents, and alleges that Defendants failed to take proper steps to investigate, discipline, or supervise Foglietta. *See, e.g.,* ¶¶1-13, 76-121. Even Defendants appear to recognize that the detailed Complaint properly alleges a negligent retention, supervision, or direction claim. Thus, the first Count surely survives.

To be sure, Defendants take issue with one portion of the first Count, by arguing that they cannot be liable for "negligent hiring." In support of that argument, they assert that a) Novello and Williams began did not begin working at Poly until after Foglietta had been hired, and b) Poly could not have known when it hired Foglietta in the 1960s that he would go on to abuse children.

Defendants' arguments rest on a mistaken assumption that Foglietta was only hired a single time, and that his propensity to abuse children only came to light years later. Critically, that assumption is at odds with the Complaint's allegations.

As discussed above, the Complaint alleges that in 1991, "a decision made ***not to renew*** Foglietta's contract." ¶142 (emphasis added). That decision was made after Poly had received credible allegations that Foglietta had sexually abused a former student, Hiltbrand. ¶¶142-147. In other words, rather than being a tenured member of faculty, Plaintiffs allege that Foglietta was a

contract employee, who had to be periodically re-hired, and was subject to *not* being rehired if his behavior was unacceptable.

The Complaint further alleges that Williams became a headmaster in 1970 and Novello in 1972, before Plaintiff enrolled at Poly. It also alleges that both men remained administrators at Poly throughout the period of Plaintiff's abuse (*i.e.,* approximately 1976-83). ¶¶34, 37, 38. If Foglietta was re-hired annually between 1966 and 1991, then all three Defendants face liability for negligent hiring (as well as negligent supervision, retention, and direction). While the terms of Foglietta's employment will be further addressed through discovery, for present purposes, the Complaint provides more than sufficient information concerning reports of misconduct that should have placed Defendants on notice of Foglietta's propensity to abuse children. For that reason as well, Defendants' motion to dismiss a portion of the first count must be denied.[9]

### III.   DEFENDANTS' CHALLENGE TO THE NEGLIGENT, RECKLESS, AND WILLFUL MISCONDUCT COUNT IS UNAVAILING

Next, Defendants seek dismissal of the Complaint's second Count. They argue that this Count should be dismissed because the Complaint's allegations of "negligent, reckless and willful misconduct" somehow do not state a viable claim under New York law. Again, they are wrong.

As the *Zimmerman* Court recognized, in addition to bringing a negligent retention or supervision claim, a plaintiff "can also sue if the school failed to exercise such care of them as a parent of ordinary prudence would observe in comparable circumstances." *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 335 (E.D.N.Y. 2012) (citations omitted). Of course, negligence is a familiar tort claim in New York. *See, e.g., Solomon v. City of New York*,

---

[9] Defendant's arguments that the allegations concerning Novello are deficient are addressed *infra*.

66 N.Y.2d 1026, 1027 (1985). To prevail on a negligence claim, "a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Id.*; *see also Pasternak v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 825 (2016). As discussed *supra*, allegations of willful or reckless conduct can allow Plaintiffs to recover in tort, and also can support a claim for punitive damages. *See Ironwood, L.L.C. v. JGB Props., LLC*, 130 A.D.3d 1527, 1529 (4th Dept. 2015).

Defendants appear to arguing be that they are not "absolutely" liable for all harm that might befall a child attending a school. That argument is a straw man. This is not a case where Plaintiff was injured by something unforeseen and unforeseeable. As related above, by the time Plaintiff was a vulnerable minor child attending Poly, in Defendants' custody and care, Defendants had repeatedly ignored multiple warnings that Coach Foglietta was preying on children. That included warnings from Jackson, Marino, parents, and Plaintiff himself. As a legal matter, there is no question that Defendants had a duty to keep students safe from sexual abuse by its employees, agents, and servants under their supervision and control, including Foglietta, to prevent the harm that ultimately affected the Plaintiff. *See Zimmerman*, 888 F. Supp. 2d at 335; *Garcia v. City of N.Y.,* 222 A.D.2d 192, 194 (1st Dept 1996); ¶176. The Complaint amply alleges with ample factual support that that duty was breached in a fashion that was not merely negligent, but reckless, willful and wanton and intentional. *See, e.g.,* ¶¶179-80.

It should also be noted that the second Count goes beyond alleging negligence in hiring, retention, supervision and direction of Foglietta. It alleges *inter alia*, that Defendants engaged in careless, negligent and reckless misconduct with utter disregard as to the potential profound injuries which would ensue, and with depraved indifference to the health and well-being of children. ¶181. It asserts that Defendants affirmatively and/or impliedly represented to minor

children, families, and the general public that employees in Poly, including Foglietta, did not

pose a risk of abusing children, and that children, including Plaintiff, would be safe in their care.

¶174. The Complaint further alleges that Defendants knew or should have known that this

representation was false, and that employing Foglietta and giving him unfettered access to

children, including Plaintiff, posed an unacceptable risk of harm to children. ¶175.

The allegations in the second Count involve egregious misconduct directed at children

and reckless indifference to Plaintiff's well-being, which does not duplicate the claims alleged in

the first count.  Plaintiff has alleged more than sufficient facts in support of its second count, and

it should not be dismissed.

## IV.    PREMISES LIABILITY WAS PROPERLY PLED

It is well settled that one in possession or control of property is liable to members of the

public who, while in their premises, are injured by the intentional harmful acts of third persons if

the defendant fails to exercise reasonable care to (a) discover that such acts were being done or

were likely to be done on the premises; or (b) give a warning adequate to enable visitors to avoid

the harm, or otherwise to protect them against it. Restatement, Torts 2d, § 344. *See Nallan v.*

*Helmsley-Spear, Inc.*, 50 N.Y.2d 507 (1980); *Jaume v. Ry Mgt. Co.*, 2 A.D.3d 590, 591 (2d Dept.

2003) ("A property owner, or one in possession or control of property, has a duty to take

reasonable measures to control the foreseeable conduct of third parties on the property to prevent

them from intentionally harming or creating an unreasonable risk of harm to others.") (citing

cases).

Here, Plaintiff's allegations satisfy the premises liability test outlined in the Second

Restatement of Torts and represent a distinct cause of action with elements that are separate and

apart from a negligence claim. The Complaint passes muster under *Nallan* and the Restatement because Plaintiff alleged that Defendants (including Williams and Novello) possessed and controlled Poly (¶192), had actual and constructive knowledge that Foglietta's sexual abuse of children was likely to occur on its premises (¶¶78-138), and failed to exercise reasonable care by removing Foglietta and/or adequately warn minors and/or parents of the foreseeable risk of sexual abuse by Foglietta (¶¶8, 113).

The facts of this case akin to a possessor of land knowingly putting a live bear trap on its property, allowing an invitee to walk into the trap, and subsequently being sued by the invitee for failure to warn and/or remove the dangerous condition from the property. The only difference here is that the bear trap is a dangerous person (Foglietta) and those in control of the premises are the Defendants. Plaintiff plainly states a case for premises liability, replete with actual, prior knowledge of Foglietta's dangerous propensities, and Defendants' creation of the danger by placing Foglietta in a position of authority and trust at Poly despite this knowledge.

Notably too, Defendants omit that New York's jurists have recognized the propriety of CVA actions under this theory. *See, e.g.,* **Ex. G**. Moreover, the elements of a premises liability claim are different from those contained in e.g., a negligence cause of action. Thus, Plaintiff has pled a viable cause of action, and the Court should permit Plaintiff to obtain discovery to flesh out the facts surrounding Defendant's creation of this danger on its premises, as distinct from other allegations.

## V.   THERE IS NO BASIS FOR DISMISSING THE CLAIM THAT DEFENDANTS BREACHED A DUTY *IN LOCO PARENTIS*

Defendants also ask the Court to dismiss the sixth count, on the ground that *in loco parentis* is not a separate tort claim. Whether *in loco parentis* is classified as a claim or simply a

way to prove that Defendants owed the plaintiff a duty is a distinction without a difference. If Defendants are correct in that *in loco parentis* is not a freestanding claim, then that is precisely why it cannot be dismissed:  only claims are subject to dismissal, not matters of proof.

There is no question that a school has a duty to adequately supervise students in its care, and may be held liable for injuries that are foreseeable and proximately related to the school's failure to provide adequate supervision. *See Mirand v. City of New York*, 84 N.Y.2d 44 (1994) ("The duty owed derives from the simple fact that a school, in assuming physical custody and control over its students, effectively takes the place of parents and guardians") (citations omitted). Under the doctrine that a school district acts *in loco parentis* with respect to its minor students, a school district owes a "special duty" to the students. *Ferguson v. City of New York*, 118 A.D.3d 849, 850 (2d Dept. 2014) (citing cases). The standard for determining whether a school has breached its duty *in loco parentis* is to compare the school's supervision and protection to that of a parent of ordinary prudence placed in the same situation and armed with the same information. *See Timothy Mc. v. Beacon City Sch. Dist.*, 127 A.D.3d 826, 828 (2d Dept. 2015). Clearly, that standard was violated by the pattern of repeatedly failing to credit or investigate reports of ongoing sexual abuse.

As related, Plaintiff was a vulnerable child under the supervision and control of Defendants, such that Defendants owed him a duty to act *in loco parentis* and to prevent foreseeable injuries.  ¶¶205-09. Plaintiff's family entrusted him to the Defendants' care by enrolling them Poly, and had every reason to expect that Poly would take reasonable steps to ensure Plaintiffs safety from sexual abuse. ¶¶43, 205-09. The abuse in question occurred on Poly's premises when Plaintiff was in Defendants' custody. If as alleged in the Complaint, Defendants were aware, or should have been aware, that Foglietta posed a danger of child sex

abuse, then they were obliged to ensure that Plaintiffs were protected from harm by not endorsing Foglietta as a trustworthy teacher and coach. [10]

## VI.  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS WAS PROPERLY PLED

There is also no basis for dismissing the negligent infliction of emotional distress claim. The profound nature of the sexual abuse Plaintiff alleges is beyond dispute. *See* ¶¶60, 186. Even Defendants acknowledge that such abuse is "horrific." Dkt. #8, p.1. A negligent infliction of emotional distress count is properly pled where, as here, a plaintiff asserts a breach of duty that either endangered plaintiff's physical safety or caused plaintiff to fear for his physical safety. *See Graber v. Bachman*, 27 A.D.3d 986, 987 (3d Dept. 2006); *see also Ferrara v. Galluchio*, 5 N.Y.2d 16, 21 (1958) ("[f]reedom from mental disturbance" is a protected interest). Plaintiffs have pled both. ¶187. While such a claim does not necessarily require physical touching, here Foglietta did in fact physically touch and abuse Plaintiff, including penetrating Plaintiff rectally with his fingers in a pattern of unlawful and repeated conduct that endured for many years.

Defendants' vague claim that such a cause of action only succeeds in "limited circumstances" offers no basis for dismissal. They appear to be arguing that – as a matter of law – their conduct was not "extreme in degree" or "outrageous." Respectfully, that is mistaken and certainly no basis for dismissal at this early stage when no discovery has occurred.

As detailed above, generations of students were abused by Coach Foglietta. The profound abuse at Poly foreseeably damaged many students' emotional health and wellbeing leaving lasting scars. Moreover, it is not just alleged that Defendants failed to notice Foglietta's misconduct. This is the rare case in which, time and time again, students *did* come forward.

---

[10] Plaintiff will withdraw the fifth count respecting breach of a fiduciary duty.

Indeed, parents spoke with school administrators as well. Defendants received oral and written warnings about Foglietta, more than once. Yet, time and time again, the school refused to credit its students, choosing to cast those who came forward as troublemakers, rather than reckon with the abuse that its students were constantly enduring.

It should also be noted that no discovery has yet occurred. While the Complaint's egregious allegations more than state a claim for negligent infliction of emotional distress, still more may be learned in discovery. Defendants' bid for an order dismissing this Count is at best highly premature.

## VII.    AS MULTIPLE COURTS HAVE HELD, PLAINTIFF'S STATUTORY CLAIMS ARE VIABLE

Defendants also challenge a breach of a duty to report under New York Social Services Law. Pursuant to Social Services Law § 413, school officials, which include but are not limited to school teachers, school guidance counselors, school psychologists, school social workers, school nurses, school administrators or other school personnel are required to report "when they have reasonable cause to suspect that a child coming before them in their professional or official capacity is an abused or maltreated child." Social Services Law § 420(2) states that "[a]ny person, official, *institution* required by this title to report a case of suspected child abuse or maltreatment who knowingly and willfully fails to do so shall be civilly liable for the damages proximately caused by such failure." Social Services Law § 420(2) (emphasis added).

As related, Plaintiff alleges that he attended Poly, a school that was under the direction and control of administrators Williams and Novello. Plaintiffs further allege that he and others reported Foglietta's abuse, and investigations did not follow. As Plaintiffs allege, Defendants were under a statutory duty to report reasonable suspicion of child abuse, they failed to report

such reasonable suspicion of abuse, and Plaintiff suffered injury at Foglietta's hands as a result. *See* ¶¶210-214. Accordingly, Plaintiffs have properly pled claims under the Social Services Law, and are entitled to discovery on that claim as well.

Faced with those allegations, Defendants raise a series of familiar objections to this Count, including that it was somehow not revived by the CVA, or that Poly did not have such reporting duties, and was free to ignore evidence that students were being abused by its teachers. These arguments are clearly mistaken as review of the Social Services law and the CVA confirms. They have been repeatedly and correctly rejected by New York's courts in CVA actions. *See, e.g.,* **Ex. H** (*Werner v. Taconic*), pp.7-8 (CVA case involving abuse by a teacher holding "that the District may be held liable for its employees' alleged failure to comply with Social Services Law 413"); **Ex. F** (*LaPorta*), p.3 (CVA decision holding that "[t]he duty to report is statutory pursuant to Social Services Law §§ 413 and 420. Defendant's motion on the ground that defendant owed no duty to plaintiff is therefore denied"); **Ex. G** (*PB-31*), p.3 ("Based on the language of CPLR 208(b) and the Child Victims Act, plaintiff's claims based upon premises liability and for breach of statutory duty to report abuse have been revived"). *See also* **Ex. G** (*Reno*), p.2 ("'It is not the duty of the mandated reporter to assess whether the abuser would be considered by Family Court to be a 'person legally responsible' or whether a 'person legally responsible' allowed the abuse to occur. If she has reasonable cause to suspect that a child has been sexually abused, the reporter must report immediately."). Consistent with those rulings, Plaintiff should be permitted to proceed forward on his statutory Count as well.

## VIII.   DEFENDANTS' ASSERTION THAT COUNTS ARE DUPLICATIVE OFFERS NO BASIS FOR DISMSISAL

Defendant also offers no reasoned basis for dismissing any count as duplicative. As shown above, the various counts have different elements and factual predicates. Moreover, even if that were not the case, "there [also] is no inherent legal error in bringing more than one cause of action with the same factual underpinning." *Manigault v. City of N.Y.*, 2012 U.S. Dist. LEXIS 205005, at *11 (S.D.N.Y. Apr. 19, 2012). *See also United States v. Cohn*, 682 F. Supp 209, 219 (S.D.N.Y. 1988) ("the government is permitted to plead multiple legal theories justifying the relief sought based on similar factual allegations") (*citing* Fed. R. Civ. P. 8(a)). Consistent with that decision, New York courts in other CVA actions have declined to dismiss properly pled counts on the ground they are "duplicative." *See, e.g.,* **Ex. E,** *Dolgas*, p.5 ("'[a]t this early juncture ... plaintiff should be permitted to plead in the alternative [and the claim] should not be dismissed as duplicative ...'") (*quoting Man Advisors, Inc. v. Selkoe*, 174 A.D.3d 435 [1st Dept. 2019]). Here too, Defendants' analysis lacks merit.

## IX.   NOVELLO WAS PROPERLY NAMED AS A DEFENDANT

Finally, Defendants try to argue that claims may not be pursued against Defendant Novello. In support of that claim, they contend that Novello did not know that Foglietta posed a danger to students, and did not own or operate Poly's premises. Once again, Defendants are mistaken, ignore the Complaint's allegations, and offer no reasoned basis for dismissal.

As discussed, Foglietta abused many students at Poly Prep over the course of two decades. Plaintiffs specifically allege that Novello was among those responsible for the training, supervision, and disciplining of Foglietta. *See, e.g.,* ¶¶36, 39. As the Complaint alleges, Novello was an administrator at Poly Prep during Plaintiff's years at the school, including serving as Head of the Middle School from 1972 and 1983. ¶¶21, 33-40. Plaintiffs further allege that

Defendants including Novello "operated, and/or controlled the premises known as POLY PREP, including the areas where the sexual abuse of Plaintiff occurred."  ¶192.

Simply put, Novello is alleged to have held a position of authority at Poly, running its Middle School, for a decade. That covers the entire period of Plaintiff's abuse at Poly. It is also a period by which time numerous students – including Marino, Jackson, and Plaintiff – came forward and complained about Foglietta, orally or in writing. Compounding that, Defendant Williams has admitted under oath that he believed that he discussed Marino's accusations with Parker or Novello. ¶109. Yet, on information and belief, Defendant Novello did not take steps to promote an investigation of Foglietta prior to or during Plaintiff's years at Poly in the late 1970s and early 1980s. ¶111. Nor did Novello not advocate for Foglietta's disciplining, removal, or firing prior to or during Plaintiff's years at Poly. ¶112. Indeed, on information and belief none of the Defendants warned students, their parents, legal authorities, or the general public that Foglietta posed a risk of sexually abusing minor prior to or during Plaintiff's years at Poly. ¶113

With those pleadings in mind, the Complaint's allegation that Novello knew or should have known of Foglietta's abuse is more than plausible. While Plaintiffs welcome the opportunity to engage in depositions to further explore the interrelationships between the Defendants, for present purposes, the they have been properly named and should remain in the case**.**

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court deny Defendants' motion, and grant such other relief as it deems just and proper.

New York, NY                              Respectfully submitted,

March 2, 2021                          PHILLIPS & PAOLICELLI, LLP

By:      /s/  *Victoria E. Phillips*

Victoria Phillips
Diane Paolicelli
Michael DeRuve
Phillips & Paolicelli, LLP
747 Third Avenue, Sixth Floor
New York, New York 10017
212-388-5100
vphillips@p2law.com
dpaolicelli@p2law.com
mderuve@p2law.com

*Attorneys for Plaintiff*