UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X

PC-41 Doe,

                        Plaintiff,                     **MEMORANDUM & ORDER**
                                                   20-CV-03628 (DG) (SJB)

        -against-

Poly Prep Country Day School, William
Williams, Michael Novello,

                        Defendants.

---------------------------------------------------------X

DIANE GUJARATI, United States District Judge:

      This case arises out of sexual abuse allegedly perpetrated against Plaintiff PC-41 Doe by a Poly Prep Country Day School ("Poly Prep") physical education teacher and coach, Philip Foglietta, while Doe was a student at Poly Prep.  Plaintiff seeks to hold liable Defendant Poly Prep; Poly Prep's former headmaster from approximately 1970 to 2000, Defendant William Williams, and Poly Prep's former middle head from at least 1972 to 1983, Defendant Michael Novello (collectively, "Defendants").  Plaintiff brings his claims in seven counts: (1) negligent hiring, retention, supervision, and direction; (2) negligent, reckless, and willful misconduct; (3) negligent infliction of emotional distress; (4) premises liability; (5) breach of fiduciary non-delegable duty;[1] (6) breach of duty *in loco parentis*; and (7) breach of statutory duties to report. *See* Complaint ("Compl.") ¶¶ 160-214, ECF No. 1.

      Pending before the Court is Defendants' Motion to Dismiss Plaintiff's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)") and the Due Process Clause of the New York State Constitution.  *See* Defendants' Motion to Dismiss

---

[1] Plaintiff has withdrawn this fifth claim, *see* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl.'s Br.") at 34 n.10, ECF No. 26, and that claim is therefore dismissed.

Plaintiff's Complaint, ECF No. 15; Defendants' Memorandum of Law in Support ("Defs.' Br."),

ECF No. 15-1.

For the reasons set forth below, Defendants' Motion to Dismiss is granted in part and

denied in part.  The First and Second Counts of the Complaint may proceed at this juncture.  The

Third, Fourth, Fifth, Sixth, and Seventh Counts are dismissed.

## BACKGROUND

### I.   Factual Background[2]

Plaintiff attended Poly Prep, a private college preparatory school located in Brooklyn,

New York, from approximately fifth grade through twelfth grade in the 1970s and 1980s.

Compl. ¶¶ 24, 41-42.  Plaintiff alleges that, while there, he "was repeatedly and unlawfully

sexually abused for years" by a Poly Prep physical education teacher and coach, Philip Foglietta.

*Id.* ¶¶ 1-4.  Foglietta, who worked for Poly Prep from approximately 1966 through 1991, *id.* ¶ 48,

was Plaintiff's PE teacher in approximately fifth through seventh grade and Plaintiff's football

coach in high school.  *Id.* ¶¶ 55-56.

Plaintiff alleges that Foglietta, now deceased, *id.* ¶ 47, was "a pedophile and sexual

predator," who "unlawfully sexually abused multiple students at Poly Prep between

approximately 1966 and 1986," *id.* ¶¶ 51-53; *see also id.* ¶ 5.  Foglietta's abuse of Plaintiff,

which took place on school premises "as frequently as several times per week," is alleged to

---

[2]  In considering a motion to dismiss under Rule 12(b)(6), a court must "accept all 'well-pleaded factual allegations' in the complaint as true . . . [and] 'construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff.'"  *Lynch v. City of New York*, 952 F.3d 67, 74-75 (2d Cir. 2020) (first quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); then quoting *Arar v. Ashcroft*, 585 F.3d 599, 567 (2d Cir. 2009) (en banc)).  Further, "[i]n considering a motion to dismiss for failure to state a claim, '[a] district court is normally required to look only to the allegations on the face of the complaint,'" though "[it] may consider documents that 'are attached to the complaint,' 'incorporated in it by reference,' 'integral' to the complaint, or the proper subject of judicial notice."  *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

have occurred between approximately 1976 and 1983, *id*. ¶¶ 12-13, 57-59, and to have included Foglietta touching and fondling Plaintiff's buttocks and genitals and penetrating Plaintiff's anus with his fingers, *id.* ¶ 60.

Plaintiff alleges that in approximately 1979-1980, he told a homeroom and music teacher, Michael Morangelli, about Foglietta's "inappropriate conduct" and "was told that his report about Foglietta's behavior would be looked into." *Id.* ¶¶ 61-62. Plaintiff further alleges that Poly Prep did not, however, "conduct a thorough investigation of Plaintiff's complaint regarding Foglietta," and "Foglietta was not fired, removed, or made to resign during Plaintiff's years at Poly Prep" or "reported to law enforcement for criminal investigation by Defendants prior to or during Plaintiff's years at Poly Prep." *Id.* ¶¶ 63-65. As alleged, Foglietta continued to abuse Plaintiff after Plaintiff "reported his abuse by Foglietta." *Id.* ¶ 67.

Plaintiff further alleges, largely based on information and belief, that several other students (and certain of their parents) told teachers and/or administrators at Poly Prep about Foglietta's actions prior to Foglietta's abuse of Plaintiff. *See, e.g.*, *id.* ¶ 130.[3] Plaintiff alleges, for example, that an eighth-grade student and his parents met in 1966 with Poly Prep's then-headmaster and then-athletic director, J. Folwell Scull and Harlow Parker, respectively, and "accused Foglietta of repeated sexual abuse" and "provid[ed] graphic details." *Id.* ¶¶ 75, 80, 85-87. In 1973, another student and his parents allegedly met with Defendant Williams and Harlow Parker and "accused Foglietta of 'fooling around with boys' in Foglietta's Car on Battery Avenue." *Id.* ¶ 96. Then, in 1974, that same student and his parents allegedly had a second meeting with Williams and Parker in which the student "again accused Foglietta of sexually

---

[3] The Complaint also contains allegations regarding yet other students who were allegedly abused by Foglietta, though whether they informed the school of their alleged abuse is not clear from the Complaint. *See, e.g.*, Compl. ¶¶ 68-69, 138.

3

abusing male students" and in which the student and his father "reported that they had witnessed Foglietta sexually abusing a child at Poly Prep." *Id.* ¶¶ 103-05.  Plaintiff alleges that Williams has acknowledged having had at least the first meeting with this student and his parents, *id.* ¶ 100, and that Williams "believed that he discussed [the student's] accusations with Parker or . . . Novello," *id.* ¶ 109.  Plaintiff further alleges, on information and belief, that "prior to and/or by the time of Plaintiff's abuse by Foglietta, Defendant Novello had been advised of reports of Foglietta's sexually abusing students." *Id.* ¶ 110.  Plaintiff additionally alleges that, in the mid-1970s, Williams received two anonymous letters and one anonymous phone call, in which the writer and/or caller indicated that Foglietta was "doing terrible things" to students.  *See id.* ¶¶ 114, 125.  Plaintiff alleges that Williams has testified that he did not believe the letters or phone call pertained to sexual abuse.  *See id.* ¶¶ 115, 127.  Plaintiff also alleges that another student – "John Doe II" – has alleged, in another case in this District, that he told a Poly Prep administrator that Foglietta was "inappropriately grabbing boys," and that Parker saw John Doe II being abused by Foglietta in the boys' showers.  *Id.* ¶¶ 131-32.

Plaintiff alleges that "Defendants engaged in a pattern of denying Foglietta's conduct, concealing his abusive behavior, conducting sham investigations, and failing to disclose the risk that Foglietta posed to the student body, their parents, and alumni at Poly Prep."  *Id.* ¶ 72; *see also id.* ¶¶ 88-89, 97-99, 101-02, 106-07, 111-13, 126, 128-29 (alleging that Poly Prep declined to meaningfully investigate or take other action with respect to Foglietta in the face of various abuse allegations, and that Defendant Williams threatened to expel one student who raised accusations about Foglietta).

Foglietta's contract was allegedly not renewed in 1991.  *Id.* ¶ 142.  Although not made public at the time, *see id.* ¶¶ 143, 148-53, the determination not to renew Foglietta's contract

resulted, as alleged, from the fact that Williams "had received credible allegations that Foglietta had sexually abused a former student," *id.* ¶ 145.

## II.    Procedural Background

Plaintiff commenced this action on August 12, 2020.  *See* Compl.  On December 15, 2020, this case was reassigned to the undersigned.  On December 18, 2020, Defendants moved to dismiss Plaintiff's Complaint.  ECF No. 15; Defs.' Br., ECF No. 15-1.  On December 22, 2020, the Court stayed briefing to ensure full compliance with Federal Rule of Civil Procedure 5.1 ("Rule 5.1").  *See* Dec. 22, 2020 Docket Entry; *see also* ECF No. 16 (Court's certification pursuant to 28 U.S.C. § 2403(b)).  On December 29, 2020, Defendants fully complied with Rule 5.1.  *See* ECF No. 19.  On March 2, 2021, Plaintiff filed his Memorandum in Opposition.  Pl.'s Br., ECF No. 26.  On March 16, 2021, Defendants filed their Reply in Support.  Defendants' Reply in Support ("Defs.' Reply"), ECF No. 27.  On August 24, 2021, Plaintiff filed a letter containing supplemental authority.  ECF No. 28.  Oral argument was held on August 25, 2021. *See* ECF No. 29.

## DISCUSSION

## I.    The CVA Satisfies the Due Process Clause of the New York State Constitution

Defendants argue that the claim-revival statute under which this case has been brought, the Child Victims Act ("CVA"), C.P.L.R. § 214-g ("Section 214-g"), runs afoul of the Due Process Clause of the New York State Constitution ("New York Due Process Clause").[4]  The Court concludes – as have the other courts that have opined on this issue – that it does not.[5]  To

---

[4]  Article I, Section 6 of the New York State Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law."  N.Y. Const. art. I, § 6.

[5]  *See, e.g.*, *Giuffre v. Dershowitz*, No. 19-CV-03377, 2020 WL 2123214 (S.D.N.Y. Apr. 8, 2020); *PB-36 Doe v. Niagara Falls City Sch. Dist.*, No. E172556/2020, 2021 WL 3044998 (N.Y. Sup. Ct., Niagara Cnty. July 19, 2021); *Dolgas v. Wales*, No. E2019-2255 (N.Y. Sup.

the contrary, the CVA, which afforded victims of childhood sexual abuse a limited period of time within which to pursue their claims of sexual abuse through the judicial system, was a reasonable, non-arbitrary response to remedy an injustice and therefore satisfies the New York Due Process Clause.

### A.   Standard of Review

Although "[r]evival is an extreme exercise of legislative power," *Regina Metro. Co., LLC v. N.Y. State Div. of Hous. & Cmty. Renewal*, 35 N.Y.3d 332, 371 (2020) (alteration in original) (quoting *Hopkins v. Lincoln Tr. Co.*, 233 N.Y. 213, 215 (1922)), New York's revival statutes – including the one at issue here – have been upheld.  *See In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 846 F.3d 58, 69 (2d Cir. 2017) ("[N]either party has cited to us, nor have we found, any case in which any New York state court has struck down any statute reviving expired claims.").

In 2017 – prior to the enactment of the CVA – the New York State Court of Appeals ("Court of Appeals") clarified the standard of review that governs challenges to the constitutionality of a claim-revival statute under the New York Due Process Clause, holding that "a claim-revival statute will satisfy the Due Process Clause of the [New York] State Constitution if it was enacted as a reasonable response in order to remedy an injustice."  *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 30 N.Y.3d 377, 400 (2017) (hereinafter *In re WTC*).

### B.   Discussion

Defendants contend that the CVA fails to meet both prongs of the standard articulated by

---

Ct., Sullivan Cnty. July 2, 2020); *Ark3 v. Diocese of Rockville Ctr.*, No. 900010/2019 (N.Y. Sup. Ct., Nassau Cnty. May 11, 2020); *Werner v. Diocese of Rockville Ctr.*, No. 900012/2019, 2020 N.Y. Misc. LEXIS 2003 (N.Y. Sup. Ct., Nassau Cnty. May 11, 2020); *Torrey v. Portville Cent. Sch.*, 66 Misc. 3d 1225(A) (N.Y. Sup. Ct., Cattaraugus Cnty. 2020).

the Court of Appeals and therefore violates the New York Due Process Clause.  Defendants

argue that, because individuals covered by the CVA could have brought their claims within the

limitations period, the CVA did not "remedy an injustice."  *See* Defs.' Br. at 11 (citing *Zumpano*

*v. Quinn*, 6 N.Y.3d 666, 676 (2006)).  Defendants further argue that in requiring defendants

(including the specific Defendants here) to defend against conduct that occurred long ago, the

CVA is not a "reasonable response" to remedy an injustice.  *See id*. at 16-17.

Defendants urge this Court to conclude that a revival statute comports with the New York

Due Process Clause *only if* the covered plaintiffs had a "total and practical inability to bring a

timely claim."  *See* Defs.' Reply at 1; *see also* Defs.' Br. at 8 ("New York Courts require a

revival statute to 'remedy an injustice' – which has always involved remedying circumstances

that made timeliness physically impossible."); Transcript of August 25, 2021 Oral Argument

("Tr.") at 3-5.  The Court declines to do so in light of *In re WTC*.

A review of the circumstances that led to the issuance of the *In re WTC* decision is

instructive.  The *In re WTC* decision was issued in response to a certified question from the

United States Court of Appeals for the Second Circuit that asked "which of two purportedly

inconsistent standards of review" found in prior New York State Court of Appeals decisions

governs the constitutionality of a claim-revival statute under the New York Due Process Clause.

30 N.Y.3d at 393.  Specifically, the question was whether the "reasonableness" standard adopted

in *Robinson v. Robins Dry Dock & Repair Co*., 238 N.Y. 271, 280 (1924), or the "serious

injustice" standard adopted in *Gallewski v. Hentz & Co.*, 301 N.Y. 164, 174 (1950), governs.  *In*

*re WTC*, 30 N.Y.3d at 393; *see also In re World Trade Ctr. Lower Manhattan Disaster Site*

*Litig.*, 846 F.3d at 70.[6]

The Court of Appeals in *In re WTC* explained that, although it did "not read" *Robinson* and *Gallewski* to be "in substantial disagreement[,] . . . th[e] case present[ed] an opportunity for [the Court of Appeals] to reconcile them and articulate a uniform standard of review." *In re WTC*, 30 N.Y.3d at 394. The Court of Appeals proceeded to do just that. After explaining that its prior claim-revival statute cases had "taken a . . . functionalist approach, weighing the defendant's interests in the availability of a statute of limitations defense with the need to correct an injustice," *id.*, the Court of Appeals went on to describe (chronologically) each of the cases in which it previously had addressed the constitutionality of a claim-revival statute under the New York Due Process Clause – *Robinson*, *Gallewski*, *McCann v. Walsh Construction Co.*, 282 A.D. 444 (3d Dep't 1953), *aff'd*, 306 N.Y. 904 (1954), and *Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487 (1989).

As the Court of Appeals set forth in *In re WTC*: In *Robinson*, following the death of her husband, the plaintiff applied for and received a workers' compensation award, which, at the time, was by law her exclusive remedy against the defendants. *In re WTC*, 30 N.Y.3d at 395. Those benefits were, however, cut off approximately two years after the husband's death, when the United States Supreme Court struck down the applicable New York workers' compensation provision as unconstitutional. *Id.* Plaintiff thereafter brought a wrongful death action against the defendants. *Id.* However, at the time, such actions were subject to a two-year statute of limitations, and plaintiff's action was brought after the two-year period had run. *Id.* In response

---

[6] The Second Circuit framed the question as follows: "Does the 'serious injustice' standard articulated in *Gallewski* . . . or the less stringent 'reasonableness' standard articulated in *Robinson* . . . govern the merits of a due process challenge under the New York State Constitution to a claim-revival statute?" *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 846 F.3d at 70.

to the Supreme Court's action, the New York State Legislature (the "Legislature") amended the law to allow plaintiffs to commence an action, even if otherwise time-barred, within one year after the statute took effect.  *Id.*

The Court of Appeals in *Robinson* upheld the claim-revival statute.  *See Robinson*, 238 N.Y. at 273-80.  In doing so, the *Robinson* court concluded that there had been "no arbitrary deprivation by the Legislature of the rights of one party in order to confer a new right upon another party," and that the statute afforded a plaintiff a "reasonable opportunity" to bring an action.  *See id*. at 280.  The Court of Appeals in *In re WTC* explained that its holding in *Robinson* "was slightly more demanding than pure reasonableness," and that "*Robinson* held that the Due Process Clause of the State Constitution is satisfied if there was an apparent injustice which calls for a remedy, and which is reasonable and not arbitrary."  *In re WTC*, 30 N.Y.3d at 399 (quotation marks and alterations omitted).  The Court of Appeals in *In re WTC* went on to explain that its next claim-revival statute case, *Gallewski*, "expressly reaffirmed the *Robinson* standard."  *Id.*

The *Gallewski* case involved an action by the administrator of the estate of an individual whose New York brokerage account had been the subject of unauthorized transactions within days of the individual having been arrested and deported to a concentration camp, where he ultimately perished.  *See In re* WTC, 30 N.Y.3d at 396.  The discovery of the unauthorized transactions did not, however, take place until after the applicable statute of limitations had run.  *See id*.  The revival statute in that case, which was upheld, revived for one year certain claims "for citizens of Axis-occupied countries during the period of such occupation."  *Id*.; *see also Gallewski*, 301 N.Y. at 172-75.

After discussing *Robinson* and *Gallewski* and noting that "[a]ny purported dichotomy

between [their] holdings is illusory,"[7] the Court of Appeals discussed its *McCann* and *Hymowitz* cases. *See In re WTC*, 30 N.Y.3d at 397-99.   In *McCann*, the Court of Appeals affirmed (without opinion) a Third Department decision finding constitutional certain amendments to the workers' compensation law that revived claims related to diseases, including caisson disease, where "the right to compensation might be barred by the operation of the Statute of Limitations even before the claimant was aware of the fact that he had the disease." *McCann*, 282 A.D. at 445-50.   And in *Hymowitz*, the Court of Appeals upheld a statute that revived for one year certain claims related to diethylstilbestrol ("DES"), a drug taken by women during pregnancy that could give rise to latent injuries. *See Hymowitz*, 73 N.Y.2d at 502-04, 513-16.

Following the discussion of each the prior claim-revival cases, the Court of Appeals in *In re WTC* observed that the "salient facts" in each case "f[e]ll into the same pattern" – first, "there existed an identifiable injustice that moved the legislature to act," and second, "in each case, the legislature's revival of the plaintiff's claims for a limited period of time was reasonable in light of that injustice." 30 N.Y.3d at 399-400.  The Court of Appeals concluded that "[a] more heightened standard would be too strict" because "[i]n the context of a claim-revival statute, there is no principled way for a court to test whether a particular injustice is 'serious' or whether a particular class of plaintiffs is blameless." *Id.* at 400.  The Court of Appeals further noted that

---

[7]  In upholding the constitutionality of the statute at issue in *Gallewski*, the Court of Appeals stated that *Robinson* "may be read, we think, as holding that the Legislature may constitutionally revive a personal cause of action where the circumstances are exceptional and are such as to satisfy the court that serious injustice would result to plaintiffs not guilty of any fault if the intention of the Legislature were not effectuated." *Gallewski*, 301 N.Y. at 174.  In addressing this language from *Gallewski*, the Court of Appeals in *In re WTC* noted that a "close reading of *Gallewski* reveals that it did not overrule or narrow *Robinson*.  To the contrary, it expressly reaffirmed the *Robinson* standard." *In re WTC*, 30 N.Y.3d at 399. The Court of Appeals in *In re WTC* went on to note that the *Gallewski* court "was describing the particular circumstances of the case before it, providing additional color on *Robinson* and concluding that the extraordinary events of World War II more than satisfied the test." *Id.*

"such moral determinations are left to the elected branches of government." *Id.* The "*judicial determination*" that must be made is whether "the revival statute was a reasonable measure to address an injustice." *Id.* (emphasis added).

In making that determination in the instant case, the Court, as an initial matter, rejects Defendants' suggestion that a claim-revival statute comports with the New York Due Process Clause only if the covered plaintiffs had a "total and practical inability to bring a timely claim."

First, the Court of Appeals pre-*In re WTC* did not establish any such general requirement. Not in *Robinson*, not in *Gallewski*, not in *McCann*, and not in *Hymowitz*. And, indeed, in *Hymowitz*, the Court of Appeals expressly condoned a revival statute – notwithstanding the defendants' contention that it "may be unconstitutionally applied in cases in which the plaintiff could have sued originally, but did not" – that revived claims for individuals who "may have known of their injuries a day, or a week, a month, or perhaps longer, *before* the original limitations period ran." 73 N.Y.2d at 514-15 (emphasis added). In the Court of Appeals' view in *Hymowitz*, "the Legislature properly determined" under the circumstances "that it would be more fair for all plaintiffs to uniformly . . . have one year to bring their actions." *Id.*[8]

Further, the Court of Appeals in *In re WTC*, while expressly taking the "opportunity . . . to . . . articulate a uniform standard of review" for claim-revival statutes, 30 N.Y.3d at 394, did not set forth a requirement that, in order to satisfy the New York Due Process Clause, a claim-revival statute must permit the bringing of only those claims as to which plaintiffs had a "total and practical inability" to file within the original statute of limitations. Rather, the rule articulated by the Court of Appeals provides only that "a claim-revival statute will satisfy the

---

[8] Additionally, the Court of Appeals in *In re WTC* noted that the circumstances in *Gallewski* "*more* than satisfied" the *Robinson* test, *In re WTC*, 30 N.Y.3d at 399 (emphasis added), thereby undercutting any suggestion that *Gallewski* somehow set a constitutional floor.

Due Process Clause of the State Constitution if it was enacted as a reasonable response in order to remedy an injustice." *See id*. at 400. And, the Court of Appeals expressly stated that a "more heightened standard would be too strict." *Id.*; *see also Giuffre*, 2020 WL 2123214, at *2 (in face of argument that CVA is unconstitutional because victim plaintiff could have bought claim within original statute of limitations, discussing *In re WTC* and concluding that CVA's claim-revival provision meets "manageable bar" set forth by Court of Appeals). This Court declines to read into the rule clearly articulated by the Court of Appeals a limitation not found therein.

Moreover, the Court notes that Defendants' urging that there be a rigid requirement of a "total and practical inability to bring a timely claim" by plaintiffs for a claim-revival statute to pass constitutional muster is inconsistent with the approach taken by the Court of Appeals in claim-revival cases. As indicated above, the Court of Appeals has considered each claim-revival statute in the context of the particular facts and circumstances at issue. *See Gallewski*, 301 N.Y. at 174 ("The tests suggested in the *Robinson* case . . . leave the court free to approach each revival statute on its individual merits, in the light of its own peculiar circumstances and setting."); *In re WTC*, 30 N.Y.3d at 394-95 ("[O]ur cases have taken a more functionalist approach, weighing the defendant's interest in the availability of a statute of limitations defense with the need to correct an injustice. Each time we have spoken on this topic, we described circumstances that would be sufficient for a claim-revival statute to satisfy the State Due Process Clause, with specific reference to the facts then before us.").

Thus, although a total and practical inability to timely bring claims may well be sufficient for a revival statute to comport with the New York Due Process Clause, it has not been deemed necessary.[9] Concomitantly, the *Zumpano* court's conclusion that sexual abuse victims could

---

[9] The revival statutes at issue in *Robinson*, *Gallewski*, *McCann*, and *Hymowitz* did, of course,

have timely brought claims does not render the CVA unconstitutional.[10]

As set forth more fully below, an application of the *In re WTC* standard here – rather than the alternative standard urged by Defendants – leads the Court to conclude that the CVA is constitutional under the New York Due Process Clause.

### 1. The CVA Seeks to Remedy an Injustice

The Court is persuaded that the CVA seeks to remedy an injustice.

The Sponsor's Memorandum in support of the CVA states:

> New York is one of the worst states in the nation for survivors of child sexual abuse. New York currently requires most survivors to file civil actions or criminal charges against their abusers by the age of 23 at most, long before most survivors report or come to terms with their abuse, which has been estimated to be as high as 52 years old on average. Because of these restrictive statutes of limitations, thousands of survivors are unable to sue or press charges against their abusers, who remain hidden from law enforcement and pose a persistent threat to public safety.

N.Y. State Assembly Mem. Supp. Legislation, reprinted in Bill Jacket for 2019 S.B. 2440, Ch. 11, at 7 (Jan. 29, 2019). The Sponsor's Memorandum goes on to state that the CVA will, *inter alia*, "finally allow justice for past and future survivors of child sexual abuse . . . and shift the significant and lasting costs of child sexual abuse to the responsible parties." *Id*. at 8; *see also id*. at 5 (Sponsor's letter noting: "Research suggests that in New York State one in four girls and one in seven boys is sexually abused before the age of 18. The sexual abuse of children is a

---

address specific, substantial barriers to the timely filing of suits. To the extent a substantial barrier is a necessary feature of a revival statute, the CVA meets that requirement, as discussed further below.

[10] Defendants place outsized reliance on *Zumpano*. *See, e.g.*, Defs.' Br. at 11-15, 17. Importantly, *Zumpano* did not address the constitutionality of a revival statute (and, indeed, the CVA had not been enacted at the time of the *Zumpano* decision). Moreover, the *Zumpano* court itself twice referenced the role the Legislature might play in the future in redressing the sexual abuse of minors. *See Zumpano*, 6 N.Y. at 671 (stating that claims like plaintiff's would, "absent relief from the Legislature[,] . . . remain unredressed"); *see also id.* at 677 ("Any exception to be made to allow these types of claims to proceed outside of the applicable statutes of limitations would be for the Legislature, as other states have done.").

particularly heinous crime and causes survivors to carry an immense amount of emotional and psychological pain long after the abuse occurred.  Victims of childhood sexual abuse must be provided the pathway to bring a case during adulthood."); Pl.'s Br. at 24-27 (citing scholarship indicating, *inter alia*, that victims of sexual abuse often take considerable time to process their abuse); *Stratmeyer v. Stratmeyer*, 1997 SD 97, ¶ 13, 567 N.W.2d 220, 222 ("Many children only realize years later the true significance of the abuse they endured, especially in cases where the molestation occurred at the hands of family members or other trusted individuals.").

Consistent with the revival statute cases cited above, including the latent injury cases, the Legislature here identified a serious harm as well as a substantial barrier to timely filing by plaintiffs seeking redress – specifically that "most survivors report or come to terms with their abuse" long after the abuse occurred.  *See* N.Y. State Assembly Mem. Supp. Legislation, reprinted in Bill Jacket for 2019 S.B. 2440, Ch. 11, at 7 (Jan. 29, 2019) (noting that the age at which survivors report or come to terms with their abuse has been estimated to be "as high as 52 years old on average"); *see also Guiffre*, 2020 WL 2123214, at *2.  In response, the Legislature was "moved . . . to act," *see In re WTC*, 30 N.Y.3d at 400, and enacted the CVA.  The CVA was enacted to remedy an injustice identified by the Legislature that results from applying restrictive statutes of limitation to claims of childhood sexual abuse.  *See* N.Y. State Assembly Mem. Supp. Legislation, reprinted in Bill Jacket for 2019 S.B. 2440, Ch. 11, at 7-8 (Jan. 29, 2019) (noting that "[b]ecause of the[] restrictive statutes of limitations, thousands of survivors are unable to sue," and concluding that passage of the CVA "will finally allow justice").

Accordingly, the CVA satisfies the first requirement of the rule set forth by the Court of Appeals in *In re WTC*.

### 2.    The Legislature's Enactment was a Reasonable Response

The Court is further persuaded that the CVA is a "reasonable response" to the identified injustice. *See In re WTC*, 30 N.Y.3d at 400. The CVA provides a means by which victims of childhood sexual abuse can pursue their claims through the judicial system, and there is no indication that the CVA is an arbitrary remedy. *See id*. at 399 (explaining that the remedy must be reasonable and not arbitrary); *see also Hymowitz*, 72 N.Y.2d at 514.

In contending that the CVA does not meet the "reasonable response" standard, *see* Defs.' Br. at 16-17, Defendants make one broadly applicable argument, and one argument specific to them. As to the former, Defendants contend that complained-of acts covered by the CVA may have occurred long ago, making them difficult if not impossible to defend. *See id.* at 16. As to the latter, Defendants assert that they would have made different strategic choices had they known that these sorts of claims would be revived. *See id.* at 17. Neither argument is persuasive.

First, Defendants' argument that the CVA is unreasonable because it reopened claims from long ago that may be difficult to defend "applies equally to any expired claim that could potentially be revived," *Sweener v. Saint-Gobain Performance Plastics Corp.*, No. 17-CV-00532, 2018 WL 2229133, at *3 (N.D.N.Y. May 16, 2018), and Defendants have not indicated why this concern is uniquely problematic in this context as compared to, for example, the latent medical harm context. The same is true of Defendants' other argument – *i.e.*, that Poly Prep made strategic decisions it might not have made had it known about the possibility of revival. Such an argument could be made of any revival statute, and Defendants have not indicated why this concern is uniquely problematic in this context.

Second, to the extent Defendants' argument implies that the CVA should have been

limited in some respect to cut off claims from long ago – *e.g.*, that only claims that accrued in the 1990s or thereafter should have been revived – such an argument ignores that the Legislature is entitled to make determinations about "fair[ness]" across plaintiffs, *see Hymowitz*, 73 N.Y.2d at 515, and that the very harm the CVA seeks to address is one that the Legislature evidently believed can take many years to be recognized and acted upon, *see* N.Y. State Assembly Mem. Supp. Legislation, reprinted in Bill Jacket for 2019 S.B. 2440, Ch. 11, at 7-8 (Jan. 29, 2019). The Court cannot conclude that the Legislature's choice in this regard was arbitrary.[11]

Given the harm the Legislature sought to address and the absence of identified unique concerns with the CVA as compared to other revival statutes, the Court is not persuaded by Defendants' arguments that the CVA is unreasonable.[12]

Additionally, although not raised by Defendants, the Court notes that the Court of Appeals has also considered the length of the revival window in assessing whether revival statutes are reasonable responses. *See In re WTC*, 30 N.Y.3d at 400 ("[I]n each case, the legislature's revival of the plaintiff's claims *for a limited period of time* was reasonable in light of th[e] injustice." (emphasis added)). In view of that consideration, too, the CVA is reasonable. The Court of Appeals has previously condoned one-year revival windows, *see, e.g.*, *Robinson*, 238 N.Y. at 276-80; *Gallewski*, 301 N.Y. at 172-75; *Hymowitz*, 73 N.Y.2d at 513-16, and the re-opening of the limitations period under the CVA was nearly as brief – one year to file, *see* 2019

---

[11] Similarly, although some individuals covered by the CVA may have "come to terms with their abuse" earlier than the passage of the CVA, *see* N.Y. State Assembly Mem. Supp. Legislation, reprinted in Bill Jacket for 2019 S.B. 2440, Ch. 11, at 7 (Jan. 29, 2019), the Court cannot conclude that it was arbitrary "[u]nder the[] circumstances" for the Legislature to "determine[] that it would be more fair for all plaintiffs to uniformly now have one year to bring their actions," *Hymowitz*, 73 N.Y.2d at 515.

[12] Although the Court need not rely on it here, "a strong presumption of constitutionality" attaches to "acts of the Legislature." *Am. Econ. Ins. Co. v. State*, 30 N.Y.3d 136, 149 (2017) (quoting *Matter of Cnty. of Chemung v. Shah*, 28 N.Y.3d 244, 262 (2016)).

N.Y. Sess. Laws ch. 11, § 3,[13] followed by one additional year, *see* 2020 N.Y. Sess. Laws ch. 130, § 1, "[a]s part of the response to the COVID-19 pandemic," Vincent C. Alexander, Supplementary Practice Commentaries, McKinney's Cons. Laws of N.Y., C.P.L.R. 214-g.  The additional time does not run afoul of the New York Due Process Clause.  *See Sweener v. Saint-Gobain Performance Plastics Corp.*, No. 17-CV-00532, 2018 WL 748742, at *8 (N.D.N.Y. Feb. 7, 2018) ("[N]othing in the cases discussed above suggests that the modest addition of two years in which to commence suit is unreasonable.").

Accordingly, in light of the foregoing and consistent with the decisions of the other courts that have opined on this issue, the Court concludes that the Legislature's response was reasonable and not arbitrary in light of the identified injustice, and that the CVA, therefore, comports with the requirements of the New York Due Process Clause.  *See In re WTC*, 30 N.Y.3d at 394 (noting that the Court of Appeals has generally "weigh[ed] the defendant's interests in the availability of a statute of limitations defense with the need to correct an injustice"); *see also Doe v. Hartford Roman Cath. Diocesan Corp.*, 317 Conn. 357, 441-42 (2015) ("Given the unique psychological and social factors that often result in delayed reporting of childhood sexual abuse, which frustrated the ability of victims to bring an action under earlier revisions of the statute of limitations, we cannot say that the legislature acted unreasonably or irrationally in determining that the revival of child sexual abuse victims' previously time barred claims serves a legitimate public interest and accomplishes that purpose in a reasonable way.").

---

[13] Although Section 214-g allowed claims to be brought "not later than one year and six months after the effective date of th[e] section," it precluded an action from being commenced "earlier than six months after" the section's "effective date."  C.P.L.R. § 214-g.  Thus, plaintiffs originally had one year within which to file actions pursuant to Section 214-g.

## II.     The First and Second Counts May Proceed and the Third through Seventh Counts are Dismissed

### A.     Standard of Review

To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The court must "accept all 'well-pleaded factual allegations' in the complaint as true . . . [and] 'construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff.'" *Lynch*, 952 F.3d at 74-75 (first quoting *Iqbal*, 556 U.S. at 679; then quoting *Arar*, 585 F.3d at 567).  However, "labels and conclusions" or "formulaic recitations of the elements of a cause of action will not do," and dismissal is proper where "the allegations in the complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 555, 558.

### B.     Plaintiff's Negligent Hiring, Retention, Supervision, and Direction Claim May Proceed

In Plaintiff's first claim, Plaintiff seeks to hold Defendants liable for negligently hiring, retaining, supervising, and directing Foglietta.  Such a claim "typically arises only when an employee acts outside of the scope of his employment and vicarious liability cannot obtain." *Marotta v. Palm Mgmt. Corp.*, No. 05-CV-10688, 2009 WL 497568, at *4 (S.D.N.Y. Feb. 25, 2009).[14]  "[I]n addition to the standard elements of negligence," a plaintiff alleging negligent

---

[14] Although Plaintiff asserts in conclusory fashion that Foglietta was acting "in the course and scope of his employment with Defendants," Compl. ¶ 169, Plaintiff has not plausibly alleged as much.  Determining whether an employee was acting within the scope of his or her

hiring, retention, supervision, and direction must show: "(1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (citations omitted) (quoting *Kenneth R. v. Roman Cath. Diocese of Brooklyn*, 229 A.D.2d 159, 161 (2d Dep't 1997)).[15]

---

employment generally "requires a fact-intensive inquiry;" however, the determination "can be made as a matter of law in some instances," and, "[i]n many New York cases, courts have held as a matter of law that an employer was not responsible for a sexual assault committed by an employee because the attack was outside the scope of the employee's duties." *Girden v. Sandals Int'l*, 262 F.3d 195, 205-06 (2d Cir. 2001). Indeed, New York courts regularly conclude, as a matter of law, that employers are not vicariously liable for sexual assaults by their employees. *See, e.g.*, *Swarna v. Al-Awadi*, 622 F.3d 123, 144-45 (2d Cir. 2010) ("New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context." (quoting *Ross v. Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998))); *Doe v. Alsaud*, 12 F. Supp. 3d 674, 677 (S.D.N.Y. 2014) (granting defendants' motion to dismiss plaintiff's vicarious liability claim, explaining that "[n]o decision in New York ha[d] been cited to date in which the doctrine of respondeat superior was held to apply to sexual assault," and collecting cases declining to impose vicarious liability); *Doe v. City of New York*, No. 09-CV-09895, 2013 WL 796014, at *4 (S.D.N.Y. Mar. 4, 2013) (noting "[a]s a matter of law sexual misconduct cannot give rise to vicarious liability," and granting defendants' motion to dismiss plaintiff's vicarious liability claim premised on a defendant officer's rape and sexual assault of plaintiff), *aff'd*, 558 F. App'x 75 (2d Cir. 2014); *Benacquista v. Spratt*, 217 F. Supp. 3d 588, 604 (N.D.N.Y. 2016) (acknowledging a "de facto bar to vicarious liability in sexual assault cases"). Although Plaintiff alleges that Poly Prep was aware of – and in some cases tolerated or covered up – Foglietta's sexual abuse, the Complaint does not plausibly allege that, for example, Foglietta's assaults "furthered [Poly Prep's] business interests," that the sexual assaults were "part of any actual responsibility [Foglietta] had to [Poly Prep]," or that "[Foglietta's] job and [Poly Prep's] business included sex crimes." *See Alsaud*, 12 F. Supp. 3d at 678.

[15] "The elements of a negligence claim under New York law are: '(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach.'" *Pasternack v. Lab'y Corp. of Am. Holdings*, 807 F.3d 14, 19 (2d Cir.), *as amended* (Nov. 23, 2015) (quoting *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002)).

Defendants do not dispute that Plaintiff's negligent hiring, retention, supervision, and direction claim against Poly Prep and Williams is sufficiently pled insofar as it concerns Foglietta's retention, supervision, and direction.  *See* Defs.' Br. at 18-21 & n.4.  And, in any event, Plaintiff has indeed alleged, in addition to the standard elements of negligence, that Foglietta was a Poly Prep employee, *see, e.g.*, Compl. ¶¶ 2, 4; that, at a minimum, Poly Prep and Williams had knowledge or were on notice of Foglietta's propensity and/or acts after he was hired but prior to Plaintiff's injuries, *see, e.g.*, *id.* ¶¶ 58, 86-87, 96, 103-04, 114, 125, 131, 133; *see also* Defs.' Br. at 19 n.4 (conceding that Plaintiff's knowledge allegations are adequate except with respect to Novello); and that the abuse occurred on school premises, *see, e.g.*, Compl. ¶ 57.

Instead, Defendants offer several reasons for dismissing the negligent hiring portion of Plaintiff's first claim.  Defendants first contend that negligent hiring is limited to "prospective employees," which Foglietta ceased being after his initial hiring in 1966, *see* Defs.' Br. at 18-21; *see also* Defs.' Reply at 5, and that Plaintiff has neither alleged that Poly Prep knew or had notice of Foglietta's propensity for abuse in 1966 (or had reason to inquire further into Foglietta prior to his 1966 hiring) nor that Williams or Novello was involved in Foglietta's hiring at that time, *see* Defs.' Br. at 18-21.  In opposition, Plaintiff argues that his negligent hiring claim should stand because the Complaint alleges that Foglietta's contract was ultimately not *renewed* in 1991 – permitting the reasonable inference that Foglietta was a contract employee subject to periodic rehiring – and that the individual Defendants were in administrative positions during the years of Plaintiff's abuse and Foglietta's rehiring – permitting the reasonable inference that they would have taken part in Foglietta's rehiring.  *See* Pl.'s Br. at 27-29.  Neither party has cited to a case directly on point.

Although Plaintiff has not adequately alleged negligence in connection with Foglietta's 1966 hiring, a negligent hiring claim can lie when an employer rehires an employee. *Cf. Detone v. Bullit Courier Serv., Inc.*, 140 A.D.2d 278, 279-80 (1st Dep't 1988) (discussing negligent hiring claim where the employee had been fired and rehired); *Kirk v. Metro. Transp. Auth.*, No. 99-CV-03787, 2001 WL 258605, at *12 (S.D.N.Y. Mar. 14, 2001) (finding a genuine issue of material fact as to negligent hiring where plaintiff adduced evidence that, *inter alia*, the entity defendant "failed to further evaluate" one of its employees "before rehiring him after new evaluations revealed [certain] propensities"). And it is a reasonable inference from Plaintiff's allegation that Foglietta's contract was ultimately not renewed, *see* Compl. ¶ 142, that Foglietta was a contract employee and, as such, was rehired on a periodic basis, including in the years Plaintiff was a student. Likewise, it can be reasonably inferred that the headmaster of Poly Prep, *id.* ¶ 35, and the head of its middle and/or lower school, *id.* ¶¶ 38, 79, were involved in the rehiring of an employee who taught and/or coached, at a minimum, fifth grade through seventh grade and high school students, *see id.* ¶¶ 55-56. Accordingly, Plaintiff's allegations are sufficient at this stage.

Defendants further argue that Plaintiff's first claim should be dismissed in its entirety as to Novello because Plaintiff has not plausibly alleged that Novello was on notice of Foglietta's conduct. *See* Defs.' Br. at 34-35. With respect to Novello's knowledge or notice, Plaintiff alleges that Williams "has testified that he believed that he discussed" a student's accusations that Foglietta was abusing students "with [Harlow] Parker or Defendant Novello." Compl. ¶ 109. Plaintiff further alleges "on information and belief" that "prior to and/or by the time of Plaintiff's abuse by Foglietta, . . . Novello had been advised of reports of Foglietta's sexually abusing students." *Id.* ¶ 110. Notwithstanding Defendants' assertion to the contrary, *see* Defs.'

21

Br. at 34, Plaintiff's allegation regarding Williams's alleged statement is not conclusory.  And, although Williams apparently did not definitively state that he told Novello, it is nevertheless plausible for present purposes that he did tell Novello.  The Complaint also does not indicate when Williams may have told Novello about Foglietta's conduct.  Nevertheless, the Complaint supports a reasonable inference that Williams told Novello about the student's accusations when the student and his family made them – *i.e.*, in 1973-1974, prior to the years during which Plaintiff was abused.  *See* Compl. ¶¶ 96, 103-05.  Accordingly, Plaintiff has plausibly alleged that Novello knew of Foglietta's propensities and/or acts.

Defendants' motion to dismiss Plaintiff's first claim is, therefore, denied.

### C.    Plaintiff's Negligent, Reckless, and Willful Misconduct Claim May Proceed

Count Two of the Complaint is entitled "negligent, reckless, and willful misconduct." *See* Compl. ¶¶ 173-84.  The Court understands Plaintiff to be alleging in this Count three separate but largely overlapping torts: negligence, gross negligence, and willful misconduct.

The first three elements of these three claims are the same: (1) the existence of a duty, (2) a breach of that duty, and (3) injury caused by the breach.  *See Pasternack*, 807 F.3d at 19 ("The elements of a negligence claim under New York law are: '(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach.'" (quoting *Lombard*, 280 F.3d at 215)); *Taylor Precision Prod., Inc. v. Larimer Grp., Inc.*, No. 15-CV-04428, 2018 WL 4278286, at *18 (S.D.N.Y. Mar. 26, 2018) (noting that the first three elements of "[a] claim of gross negligence or willful misconduct [are] . . . : '(1) the existence of a duty; (2) a breach of that duty; [and] (3) injury as a result thereof'" (quoting *Purchase Partners, LLC v. Carver Fed. Sav. Bank*, 914 F. Supp. 2d 480, 497 (S.D.N.Y. 2012))); *see also Pasternack v. Lab'y Corp. of Am.*, 892 F. Supp. 2d 540, 552 (S.D.N.Y. 2012) ("Where a claim for ordinary negligence fails, a gross negligence claim necessarily fails.").

22

The latter two claims additionally require allegations of "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *Taylor Precision Prod., Inc.*, 2018 WL 4278286, at *18. Said otherwise, "gross negligence and willful misconduct are tort claims of a similar strain, with a slight disparity between their fourth elements: 'while gross negligence involves a devil-may-care attitude or indifference to duty amounting to recklessness, willful misconduct has been defined as a conscious indifference or I don't care attitude which is the prerequisite of wanton behavior.'" *Id.* at *18 n.13 (alterations adopted) (quoting *Coco Invs., LLC v. Zamir Manager River Terrace, LLC*, 26 Misc. 3d 1231, at *5 (N.Y. Sup. Ct., N.Y. Cnty. 2010)).

Here, Plaintiff has plausibly alleged the first three elements of his negligence, gross negligence, and willful misconduct claims. Starting with the duty element, it is well settled that "[i]n New York, schools are under a special duty of *in loco parentis*," *Hammond v. Lincoln Tech. Inst., Inc.*, No. 10-CV-01933, 2012 WL 273067, at *6 (E.D.N.Y. Jan. 30, 2012), which obligates them to "exercise such care of [their charges] as a parent of ordinary prudence would observe in comparable circumstances," *Mirand v. City of New York*, 84 N.Y.2d 44, 49 (1994) (quoting *Hoose v. Drumm*, 281 N.Y. 54, 57-58 (1939)). "Schools are not insurers of safety, however, for they cannot reasonably be expected to continuously supervise and control all movements and activities of students." *Mirand*, 84 N.Y.2d at 49. Nevertheless, by virtue of "assuming physical custody and control over [their] students" and "effectively tak[ing] the place of parents and guardians," schools "must 'adequately supervise the students in their charge and they will be held liable for foreseeable injuries proximately related to the absence of adequate supervision.'"

23

*Hammond*, 2012 WL 273067, at \*6 (quoting *Mirand*, 84 N.Y.2d at 49); *see also, e.g.*, *Meyer v. Magalios*, 170 A.D.3d 1163, 1164 (2d Dep't 2019).[16]

As for Defendants' breach, "[t]he standard to determine whether the school has breached its duty [to students] is to compare the school's supervision and protection to that of 'a parent of ordinary prudence placed in the identical situation and armed with the same information.'" *Dia CC*, 304 A.D.2d at 956 (quoting *Mary KK. v. Jack LL.*, 203 A.D.2d 840, 841-42 (3d Dep't 1994)); *see Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 335 (E.D.N.Y. 2012). "[T]he adequacy of supervision and proximate cause . . . are generally factual questions for the jury." *Wood v. Watervliet City Sch. Dist.*, 30 A.D.3d 663, 664 (3d Dep't 2006); *see also Pasternack*, 807 F.3d at 19 ("[J]uries determine whether and to what extent a particular duty was breached."); *Lombard*, 280 F.3d at 216 (noting that causation is an issue "generally and more suitably entrusted to fact finder adjudication").

Drawing all reasonable inferences in Plaintiff's favor, given, for example, the number of alleged incidents of abuse, *see, e.g.*, Compl. ¶¶ 52-53, 59, Defendants' alleged knowledge of at least some of those abuses, *see, e.g.*, *id.* ¶¶ 85-112, Foglietta's alleged "unfettered access" to students, *id.* ¶ 175, Plaintiff's allegation that he continued to be abused on school premises after reporting his abuse, *id.* ¶ 67, Plaintiff's allegation that the school "failed to have in place" sufficient measures to monitor, supervise, or oversee students' interactions with Foglietta, *id.*

---

[16] "A necessary element of a cause of action alleging negligent supervision [related to an individual's intentional acts] is that the [school] knew or should have known of [the offending individual's] propensity for [the injury-causing conduct]." *See Wienclaw v. E. Islip Union Free Sch. Dist.*, 192 A.D.3d 945, 946 (2d Dep't 2021); *see also Dia CC v. Ithaca City Sch. Dist.*, 304 A.D.2d 955, 956 (3d Dep't 2003) (applying standard to teachers' intentional acts); *Brandy B. v. Eden Cent. Sch. Dist.*, 15 N.Y.3d 297, 302-03 (2010). For the reasons stated above, Plaintiff has sufficiently alleged that Defendants knew or were at least on notice of Foglietta's propensity (and acts).

¶ 179, and Plaintiff's allegations that Defendants did not meaningfully investigate or respond to accusations of abuse, *see e.g.*, *id.* ¶¶ 63, 72, 81, 88-89, 98-99, 101-02, 106, 111-13, 128-29, 174, through which they could possibly have learned more of the need for further student supervision, Plaintiff has plausibly alleged that the level of supervision and protection provided by Defendants fell below that of an identically situated, ordinarily prudent parent.  And Plaintiff has plausibly alleged that Defendants' failures in these regards were a substantial cause of his injuries.

Accordingly, Plaintiff has plausibly alleged negligence, and that claim may proceed at this juncture.[17]

In light of substantially the same allegations just discussed, Plaintiff has also plausibly alleged that Defendants acted in ways evidencing gross negligence or willfulness.  Plaintiff's allegations sufficiently evidence "a devil-may-care attitude or indifference to [a] duty amounting to recklessness" and/or "a conscious indifference or I don't care attitude" at this stage.  *See Taylor Precision Prod., Inc.*, 2018 WL 4278286, at *18 n.13 (quotation marks omitted).  Indeed,

---

[17] Certain of the allegations made with respect to Plaintiff's negligence claim overlap with allegations made with respect to Plaintiff's negligent hiring, retention, supervision, and direction claim.  *Compare, e.g.*, Compl. ¶ 166 (alleging that Defendants "were negligent and failed to use reasonable care in hiring, appointing, assigning, and retention of Foglietta"), *with id.* ¶ 178 (alleging that Defendants "carelessly, negligently, recklessly, willfully, and intentionally failed to have in place an appropriate policy and/or practice for making hiring, assignment, and retention decisions, so as to protect vulnerable students in their care from sexual abuse").  Plaintiff also seeks the same damages based on those allegations.  *Compare, e.g.*, *id.* ¶¶ 171-72, *with id.* ¶¶ 183-84; *see also, e.g.*, *Deutsche Bank Nat. Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015) ("Under New York law, claims are duplicative when both arise from the same facts and seek the identical damages for each alleged breach." (quotation marks omitted)).  However, given that there are sufficient, distinct factual allegations supporting the negligence claim that do not overlap with the first claim, both claims will proceed and this juncture.  *See Apple v. Atl. Yards Dev. Co., LLC*, No. 11-CV-05550, 2012 WL 2309028, at *6 (E.D.N.Y. June 18, 2012) ("Of course, [plaintiffs] cannot obtain a duplicative recovery, but that can be addressed at a later stage of the case, if necessary.").

other courts have concluded that similar facts – when supported by record evidence – were sufficient to meet the "extreme and outrageous" conduct prong of intentional infliction of emotional distress ("IIED") claims.  *See, e.g.*, *Pinks v. Turnbull*, 25 Misc. 3d 1245(A) at *7 (N.Y. Sup. Ct., N.Y. Cnty. 2009) (denying defendants' summary judgment motion as to plaintiff's IIED claim where questions of fact remained as to whether one of the entity defendants failed "to take any action to protect plaintiff from the presence of his tormentor *after* it had notice" (emphasis added)).

Plaintiff's gross negligence and willful misconduct claims also may proceed at this juncture.

### D.    Plaintiff's Negligent Infliction of Emotional Distress ("NIED"), Premises Liability, and Breach of Duty *In Loco Parentis* Claims are Dismissed

"Under New York law, claims are duplicative when both arise from the same facts and seek the identical damages for each alleged breach."  *Deutsche Bank Nat. Tr. Co.*, 810 F.3d at 869 (quotation marks omitted); *see also, e.g.*, *Frank v. OOO RM Inv.*, No. 17-CV-01338, 2020 WL 7022317, at *18 (E.D.N.Y. Nov. 30, 2020) ("'[I]t is not the theory behind a claim that determines whether it is duplicative,' but rather the conduct alleged and the relief sought." (quoting *MIG, Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P.*, 701 F. Supp. 2d 518, 532 (S.D.N.Y. 2010), *aff'd*, 410 F. App'x 408 (2d Cir. 2011))).  Here, Plaintiff's third, fourth, and sixth claims are dismissed as duplicative of Plaintiff's first and second claims.[18]

---

[18] To state a claim for negligent infliction of emotional distress, a Plaintiff must allege "(1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm."  *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021) (en banc).  However, "[a] claim for negligent infliction of emotional distress cannot be asserted if it is essentially duplicative of tort or contract causes of action."  *C.T. v. Valley Stream Union Free Sch. Dist.*, 201 F. Supp. 3d 307, 327 (E.D.N.Y. 2016) (quotation marks omitted).

Contrary to Plaintiff's arguments – and although Plaintiff uses slightly different language in each – the "gravamens of [the] claims are substantially identical." *Sang Lan v. AOL Time Warner, Inc.*, No. 11-CV-02870, 2012 WL 1633907, at *2 (S.D.N.Y. May 9, 2012). In substance, Plaintiff alleges in each of his third, fourth, and sixth claims that Defendants breached a duty by failing to take certain measures that would have protected Plaintiff at school (whether by, for example, firing or better supervising Foglietta, or by better supervising or protecting Plaintiff), despite knowing of a danger at the school – *i.e.*, Foglietta – and that Defendants' failure caused Plaintiff harm. *See* Compl. ¶¶ 185-97, 205-09. These are essentially the same allegations underpinning Plaintiff's first and second claims. *See id*. ¶¶ 160-84. In addition to the overlapping "conduct," the undifferentiated "resulting injur[ies]," *Deer Park Enters., LLC v. Ail Sys., Inc.*, 57 A.D.3d 711, 712 (2d Dep't 2008), are essentially identical, and Plaintiff neither alleges distinct damages nor argues that they differ in some respect, *see* Compl. ¶¶ 171-72, 183-84, 189-90, 196-97, 208-09; *see also* Tr. at 25.

Indeed, Plaintiff virtually concedes that his *in loco parentis* claim is subsumed within his negligence claim. *See* Tr. at 21 ("I'm happy for [breach of duty *in loco parentis*] to be subsumed within another count . . . ."); Pl.'s Br at 32-33 ("Whether *in loco parentis* is classified as a claim or simply a way to prove that Defendants owed the plaintiff a duty is a distinction without a difference."); *compare* Pl.'s Br. at 33 (discussing Plaintiff's sixth claim and noting "there is no question that a school has a duty to adequately supervise students in its care, and may be held liable for injuries that are foreseeable and proximately related to the school's failure to provide

---

A premises liability "action . . . will be successful if . . . there is an unreasonably unsafe condition on the defendant's property that the defendant knows or should have known about, and this unreasonably unsafe condition causes a foreseeable plaintiff's injuries." *Gorecki v. Painted Pony Championship Rodeo, Inc.*, 6 F. App'x 103, 105 (2d Cir. 2001); *see also, e.g.*, *Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 570 (S.D.N.Y. 2010).

adequate supervision"), *with* Compl. ¶ 176 (describing, under Plaintiff's second claim, Poly

Prep's duty to "keep students safe from sexual abuse . . . and to prevent the harm that ultimately

affected the Plaintiff").

And, in similar CVA actions, both NIED and premises liability claims have been

dismissed as duplicative of other tort claims.[19] *See, e.g.*, *Lawrence K. v. Westchester Day Sch.*,

196 A.D.3d 637, 148 N.Y.S.3d 382, 383 (2d Dep't 2021) (affirming dismissal of premises

liability claim related to sexual assault by a day school teacher as duplicative of plaintiff's

"negligent supervision and negligent retention causes of action" where the two were based on

"the same facts" and did not allege "distinct damages"); *PC-4 Doe v. Archdiocese of New York*,

No. 950203/2020, 2021 WL 2719337, at *3-4 (N.Y. Sup. Ct., N.Y. Cnty. July 1, 2021)

(dismissing NIED claim as duplicative of negligence causes of action and dismissing premises

liability claim as duplicative of negligent hiring, retention, supervision and/or direction claim);

*PB-36 Doe*, 2021 WL 3044998, at *2 (dismissing premises liability claim as duplicative of

negligence causes of action); *Torrey*, 66 Misc. 3d 1225(A) at 3 (dismissing NIED claim as

duplicative of negligence causes of action).   Additionally, courts have dismissed NIED and

premises liability claims relating to sexual assault as duplicative of negligence and negligent

hiring, retention, and supervision claims when confronted with similar allegations outside of the

CVA context.   Those cases are also instructive.   In *Doe v. Uber Technologies, Inc.* for example,

the plaintiff asserted, *inter alia*, claims for negligence, negligent hiring, screening, and

supervision, and NIED against Uber based on an alleged sexual assault perpetrated by an Uber

driver.   *See* No. 20-CV-08446, 2021 WL 3193166, at *3-4, *11 (S.D.N.Y. July 28, 2021).   The

---

[19] At oral argument, in support of his argument that his premises liability claim is distinct from his first and second claims, Plaintiff referenced factual allegations not contained in the Complaint, *see* Tr. at 24, which are not cognizable at this stage, *see Strock*, 982 F.3d at 63.

court, however, dismissed the plaintiff's NIED claim as duplicative, noting that "the allegations supporting [the plaintiff's] NIED claim track[ed] the allegations supporting [her] negligent screening, hiring, and supervision claim, as well as her negligence claim," as they "all concern[ed] whether [defendant] breached its duty by failing to implement safety measures or by negligently hiring, retaining, and supervising [the alleged sexual assaulter], which permitted [him] to sexually assault [the] [p]laintiff." *Id.* at *12-13; *see also C.T.*, 201 F. Supp. 3d at 327-28 (dismissing NIED claim relating to bullying and harassment as duplicative of a negligent supervision claim against school). The same is true here. And in *Wilson v. Diocese of New York of the Episcopal Church*, the court granted summary judgment on a premises liability claim relating to alleged sexual assault by a priest. No. 96-CV-02400, 1998 WL 82921, at *6 (S.D.N.Y. Feb. 26, 1998). In so doing, the court noted that it was "apparent from the . . . complaint" that plaintiff's premises liability claim was "simply a repackaging of the plaintiff's claim of alleged failure to supervise," as the "the premises liability [was] based upon the defendants' alleged failure to know that [the priest] represented an unreasonable risk to the plaintiff, and that [the priest's] propensity for sexual misconduct made the premises unsafe." *Id.*; *see also Nouel v. 325 Wadsworth Realty LLC*, 112 A.D.3d 493, 494 (1st Dep't 2013) (concluding that claim "couched as a premises liability claim" was "merely duplicative of [plaintiff's] negligent hiring, retention, and supervision claims"). Plaintiff's premises liability claim here suffers similarly.

Plaintiff's NIED, premises liability, and *in loco parentis* claims are dismissed.

### E.    Plaintiff's Breach of Statutory Duties to Report Claim is Dismissed in Light of the Then-Applicable Statutory Framework

Count Seven of the Complaint alleges that Defendants knowingly, willfully, and intentionally breached their statutory duty, pursuant to New York Social Services Law § 413

("Section 413") and § 420 ("Section 420"), to report child abuse, which breach proximately

caused Plaintiff's injuries.  *See* Compl. ¶¶ 210-14.  Defendants raise a variety of arguments in

support of dismissing this count, *see* Defs.' Br. at 29-32; Defs.' Reply at 8, including that

Foglietta was not a "person legally responsible" within the meaning of the then-applicable

statutory framework and therefore no reporting obligation by Defendants was triggered, *see*

Defs.' Br. at 30.  For the reasons that follow, Plaintiff's seventh claim is dismissed.

### 1.    Applicable Statutory Framework

During the relevant time period, Section 413 provided that "school official[s]" must

"report or cause a report to be made . . . when they have reasonable cause to suspect that a child

coming before them in their professional or official capacity is an abused . . . child."  *See* 1973

N.Y. Sess. Laws ch. 1039, § 1; N.Y. Soc. Serv. L. § 413.  An abused child, in turn, was defined

in New York Social Services Law § 412(1) as a "child under sixteen years of age defined as an

abused child by the family court act."  The Family Court Act defined an "abused child," in part,

as "a child less than sixteen years of age whose parent or other person legally responsible for his

care . . . commits, or allows to be committed, a sex offense against such child, as defined in the

penal law, provided, however, that the corroboration requirements contained therein shall not

apply to proceedings under this article."  1972 N.Y. Sess. Laws ch. 1015, § 1; N.Y. Fam. Ct. Act

§ 1012(e)(iii).  Section 1012(g) of the Family Court Act stated that a "person legally responsible"

"includes the child's custodian, guardian, [or] any other person responsible for the child's care at

the relevant time.  Custodian may include any person continually or at regular intervals found in

the same household as the child when the conduct of such person causes or contributes to the

abuse or neglect of the child."  1972 N.Y. Sess. Laws ch. 1015, § 2; N.Y. Fam. Ct. Act

§ 1012(g); *see also* 1973 N.Y. Sess. Laws ch. 1039, § 1 (defining "person legally responsible" in

Section 412(3) as "a person legally responsible as defined by the family court act").  And, under

Section 420, "[a]ny person, official or institution [who was] required by th[e] title to report a

case of suspected child abuse . . . who knowingly and willfully fail[ed] to do so" was "civilly

liable for the damages proximately caused by such failure."  1973 N.Y. Sess. Laws ch. 1039, § 1;

N.Y. Soc. Serv. L. § 420(2).[20]

### 2.   Discussion

Applying the law applicable during the relevant time period, the Court considers whether

Foglietta – as a teacher and coach – necessarily qualified as "legally responsible" for the students

he allegedly abused such that any knowledge of the alleged abuse by Defendants necessitated

filing a report, and whether, if not, taking Plaintiff's allegations as true and drawing all

reasonable inferences in Plaintiff's favor, the circumstances allegedly described to Defendants

provided them with reasonable cause to believe that Foglietta was "legally responsible" for the

students he abused such that they were abused children within the meaning of the Social Services

Law and the Family Court Act.[21]

---

[20] The portions of the Social Services Law and the Family Court Act relevant here are essentially the same today as they were at the time of Plaintiff's alleged abuse.

[21] To the extent Plaintiff contends with this issue, he does so by citing to *Reno v. Wheatland-Chili Central School District*, No. E2020001722, Slip Op. at 2 (N.Y. Sup. Ct., Monroe Cnty. Jan. 11, 2021), which cited to *Kimberly S.M. ex rel. Mariann D.M. v. Bradford Central School District*, 226 A.D.2d 85, 90 (4th Dep't 1996), a case in which the court stated: "It is not the duty of the mandated reporter to assess whether the abuser would be considered by Family Court to be a 'person legally responsible' or whether a 'person legally responsible' allowed the abuse to occur.  If she has reasonable cause to suspect that a child has been sexually abused, the reporter must report immediately."  *See* Pl.'s Br. at 36; Tr. at 30.  The same quote from *Kimberly S.M.* was later cited by the Third Department in rejecting an argument that certain individuals were not required to report abuse allegedly perpetrated against a minor child by the minor child's minor half-brother "because [the half-brother] was not a person legally responsible for [the minor child's] care."  *Catherine G. v. County of Essex*, 307 A.D.2d 446, 449 (3d Dep't 2003).  On appeal, however, the Court of Appeals reversed in relevant part, finding that the plaintiff's claim was "patently meritless" because the half-brother was neither a parent, guardian, nor a personally legally responsible for the plaintiff's daughter's care; a duty

As to the first question, the Court of Appeals has explained that teachers, even as "persons who provide extended daily care of children in institutional settings," should not be "construed" as "other person[s] legally responsible for [a] child's care." *Matter of Yolanda D.*, 88 N.Y.2d 790, 796 (1996) (discussing N.Y. Fam. Ct. Act § 1012); *see also id.* ("A person is a proper respondent in an article 10 proceeding as an 'other person legally responsible for the child's care' if that person acts as the functional equivalent of a parent in a familial or household setting."). Accordingly, Defendants' alleged knowledge of Foglietta's alleged abuse was insufficient, by itself, to trigger a duty to report.

As to the second question, Plaintiff has not plausibly alleged that the circumstances described to Defendants provided them with reasonable cause to believe that the abuse involved abused children within the meaning of the Social Services Law and the Family Court Act. As alleged in the Complaint, the children (in some cases with their parents) informed Defendants (or a subset thereof) that they – or others – were being abused at school by a physical education teacher and coach. These allegations do not suggest that the children or parents conveyed information suggesting that Foglietta was "legally responsible," as the term is used in the Social Services Law, for the students he allegedly abused. Nor do these allegations suggest that the

---

to report would have arisen only if the respondents had concerns regarding the minor daughter's *mother's* ability to address the abuse, given that the mother – as opposed to the son – could qualify as a parent or person "legally responsible" who was abusing the child or allowing it to occur. *See Catherine G. v. County of Essex*, 3 N.Y.3d 175, 178-81 (2004). In an opinion relating to the abuse at issue in *Catharine G.*, the Second Circuit applied the Court of Appeals' ruling in *Catherine G.* in finding that a pediatrician who was told about the half-brother's alleged abuse, given "the information she had at the time, . . . did not have a duty to report under New York's mandatory reporter laws." *Page v. Monroe*, 300 F. App'x 71, 74 (2d Cir. 2008). There, as in the Court of Appeals' *Catherine G.* decision, the Second Circuit explained that it "would only have been a reportable incident had [the pediatrician] thought that [the mother], or any other adult legally responsible for the children's care, was incapable or unwilling to protect the children from the potential abuse." *Id.* at 73-74.

parents of allegedly abused students were allowing the abuse to happen.  Accordingly, the Court

concludes – based on the legal requirements at the time – that Defendants did not have a duty to

report Foglietta's abuse under Section 413.[22]

Two features of the law in this area further support this conclusion.  First, the Family

Court Act "contemplates intervention in relationships between children and their parents (or

guardians or custodians)."  *Catherine G.*, 3 N.Y.3d at 180; *see also* N.Y. Fam. Ct. Act § 1011

("This article . . . is designed to provide a due process of law for determining when the state,

through its family court, may intervene against the wishes of a parent on behalf of a child so that

his needs are properly met.").  Second, a specific duty to report, *inter alia*, staff-on-student abuse

is provided for by another law enacted after the relevant events[23] – suggesting that such a duty

did not already exist, including within the Family Court Act.  *See, e.g.*, N.Y. Educ. L. § 1126

(setting forth the duties of, *inter alia*, teachers and school administrators to report instances of

child abuse involving "a child [that] has been subjected to child abuse by an employee or

volunteer in an educational setting"); *see also People v. Heil*, 16 Misc. 3d 1125(A), at *6-7 (N.Y.

Cnty. Ct., Monroe Cnty. 2007) ("While the facts in *Kimberly S.M.* did not directly address the

obligations of school officials to report a sex abuse charge against one of its own school

---

[22] Foglietta, as someone who was not "legally responsible," for the reasons stated above, also
could not have been the "subject of the report," as "subject of the report" was defined in New
York Social Services Law § 412(4) to be "any child reported to the central register of child
abuse or maltreatment and his or her parent, guardian *or other person legally responsible* also
named in the report."  *See* 1973 N.Y. Sess. Laws ch. 1039, § 1; N.Y. Soc. Serv. L. § 412(4)
(emphasis added).

[23] Education Law § 1126 became effective in 2001.  *See* 2000 N.Y. Sess. Laws. ch. 180, § 12;
*see also id.* § 1 ("[T]he abuse of children when they are in educational settings by persons in a
position of trust is an ongoing and persistent problem.  This problem is largely unaddressed in
state statute or regulation.  No standard statewide policy exists for the reporting, investigation
or identification of this form of child abuse.  Standardization and consistency are necessary and
appropriate for the protection of the school children of New York state.").

teacher/employees, the legislature did settle this issue in 2000 by enacting Article 23–B of the Education Law, titled 'Child Abuse in an Education Setting.'").  And, in fact, Section 1125 was amended in 2018 such that staff-on-student abuse in private schools thereafter fell within the scope of Section 1126.  *See* 2018 N.Y. Sess. Laws ch. 363, § 1.  According to the Sponsor's Memorandum, prior to the 2018 amendment, "private schools [were] not included in Article 23-B of the Education Law, leaving a serious void in the effort to ensure child abuse is immediately reported to law enforcement."  N.Y. State Assembly Mem. Supp. Legislation, reprinted in Bill Jacket for 2018 A.B. 8485, Ch. 363, at 9 (Dec. 7, 2018).  Accordingly, the act was passed to "ensure that all children [were] protected by requiring school administrators and superintendents in all of New York's schools to immediately report allegations of child abuse." *Id.*

Plaintiff's breach of statutory duties to report claim is dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, ECF No. 15, is granted in part and denied in part.  Counts One and Two of the Complaint may proceed at this juncture.  Counts Three through Seven of the Complaint are dismissed.

SO ORDERED.

*/s/ Diane Gujarati*
DIANE GUJARATI
United States District Judge

Dated: September 22, 2021
Brooklyn, New York

34